IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDDIE LEVERT and WALTER WILLIAMS,
d/b/a/ THE O'JAYS

v.

PHILADELPHIA INTERNATIONAL
RECORDS, ASSORTED MUSIC, INC.,
GAMBLE-HUFF, KENNETH GAMBLE,
CHUCK GAMBLE, LEON HUFF, and THE
RIGHT STUFF/A DIVISION OF CAPITOL
RECORDS, INC.

Civil Action No. 04-1489

---

### DECLARATION OF OREN J. WARSHAVSKY IN SUPPORT OF DEFENDANT CHUCK GAMBLE'S MOTION FOR SUMMARY JUDGMENT

---

**I, OREN J. WARSHAVSKY** hereby declare as follows:

1. I am associated with the firm Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., counsel to defendants in this action. I have been admitted to act as counsel *pro hac vice* in this action. I submit this declaration in support of Chuck Gamble's motion for summary judgment.

2. Attached hereto as Exhibit A is a true and accurate copy of pages from Plaintiffs' Responses to Defendants' Interrogatories.

3. Attached hereto as Exhibit B is a true and accurate copy of pages of the transcript from the September 14, 2004 conference in this action.

4. Plaintiffs have produced no documents to defendants since September 14, 2004.

5. Attached hereto as Exhibit C is a true and accurate copy of pages of the transcript of the September 30, 2004 deposition of Plaintiff Walter Williams in this action.

**6.** Attached hereto as Exhibit D is a true and accurate copy of pages of the transcript of the October 22, 2004 deposition of defendant Chuck Gamble in this action.

**7.** Attached hereto as Exhibit E is a true and accurate copy of the 1972 contract between Plaintiffs and Gamble-Huff Productions, Inc.

**8.** Attached hereto as Exhibit F is a true and accurate copy of the 1975 amendment to the 1972 contract, identified in ¶ 7 above.

**9.** Attached hereto as Exhibit G is a true and accurate copy of the 1977 contract between Plaintiffs and defendant Assorted Music, Inc.

**10.** Attached hereto as Exhibit H is a true and accurate copy of the 1979 contract between Plaintiffs and defendant Assorted Music, Inc.

**11.** Attached hereto as Exhibit I is a true and accurate copy of the 1980 amendment to the 1979 contract, identified in ¶ 10 above.

**12.** Attached hereto as Exhibit J is a true and accurate copy of the 1982 amendment to the 1979 contract, identified in ¶ 10 above.

**13.** Attached hereto as Exhibit K is a true and accurate copy of the 1984 amendment to the 1979 contract, identified in ¶ 10 above.

**14.** Attached hereto as Exhibit L is a true and accurate copy of pages of the transcript of the September 29, 2004 deposition of Plaintiff Edward Levert in this action.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and understanding.

Dated: November 4, 2004
   New York, New York

_____
   Oren J. Warshavsky

# EXHIBIT "A"



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDDIE LEVERT, WALTER WILLIAMS,  
d/b/a/ THE O'JAYS,

        v.

PHILADELPHIA INTERNATIONAL RECORDS,  
ASSORTED MUSIC, INC., GAMBLE-HUFF  
PRODUCTIONS, KENNETH GAMBLE, CHUCK  
GAMBLE, and LEON HUFF

       and

THE RIGHT STUFF/A DIVISION OF CAPITOL  
RECORDS, INC.

Civil Action No. 04-1489

Jury Trial Demand

## PLAINTIFFS' RESPONSE TO DEFENDANTS' INTERROGATORIES

Plaintiffs Eddie Levert and Walter Williams, hereby respond under oath as follows:

*Interrogatory No. 1.*   Identify each witness Plaintiffs reasonably anticipate calling at trial, and describe the facts that they will be called to testify to.

1. Eddie Levert, Sr. and Walter Williams, Sr.

2. Messrs. Levert and Williams will testify concerning their contractual relationship with Defendants from 1972 to 1983. They will testify to their refusal to sign Defendant Capitol's numerous belated and "urgent" requests for mechanical license permissions. Plaintiffs will provide information as to their refusal to sign copyright assignment contracts. Plaintiffs will additionally testify concerning the circumstances and execution of the non-integrated contracts on which this lawsuit is based. Plaintiffs will testify to the recording and album selection process while they were under contract with Leon Huff, Kenneth Gamble, Assorted Music, Inc. and Gamble Huff Productions. They will testify as to compilations and releases on which they

never received any royalties or any accounting. They will testify to their refusal to cooperate in the release of previously unreleased masters; they will testify to the unexplained charges assessed against them in connection with an album they did not support; they will testify that they did not receive an estimated budget in connection with "Together We Are One;" they will testify that Defendants have never provided them with an itemized accounting of charges assessed against their royalty accounts and to the fact that when they questioned these accountings, Defendants responded by adding new unexplained charges. Plaintiffs will offer support for the fact that Defendants Gamble, Gamble, Huff, Assorted Music, Gamble Huff Productions and "PIR" claimed they could not provide timely accountings to Plaintiffs because their new team of royalty managers was hampered by Defendants' computer software and hardware problems and a lack of confidence in the royalty statements they provided.

3. Custodian of Records AFTRA – who will introduce records of payments made to retirement and health benefits funds on behalf of Plaintiffs by Defendants.

4. Connie Hagler, office manager and/or bookkeeper for "PIR".

5. Royalty manager of Capitol Records

6. Natasha Johnson: Royalty Manager for "PIR" as to revised royalty statements prepared and forwarded by her on September 18, 2003.

7. Phillip Asbury, Esquire, General Counsel to Gamble Huff, who will be called to testify to the status of royalty payments due Plaintiffs under contracts with Gamble Huff; the assessment of charges by Gamble Huff against Plaintiffs' recoupment account for attorneys' fees and the cost of suit in the instant matter; the inaccurate royalty accounting procedures employed by Gamble Huff relative to Plaintiffs' royalty account and measures, if any, taken to rectify the

2

inaccuracies; and all matters pertinent to Plaintiffs' contract status with Gamble Huff during the tenure of Mr. Asbury as General Counsel to Defendants.

8. Kenneth Gamble, who will be called to testify to his personal guaranty of liability/responsibility regarding the 1979 contract signed between Plaintiffs and Gamble Huff; the status of royalty payments due Plaintiffs under contracts with Gamble Huff; the assessment of charges by Gamble Huff against Plaintiffs' recoupment account for attorneys' fees and the cost of suit in the instant matter; the inaccurate royalty accounting procedures employed by Gamble Huff relative to Plaintiffs' royalty account and measures, if any, taken to rectify the inaccuracies; and all matters pertinent to Plaintiffs' contract status with Gamble Huff since 1972.

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | |
|---|---|
| EDDIE LEVERT, et al., | : CIVIL ACTION NO. 04-1489 |
| Plaintiffs | : |
| | : |
| v. | : Philadelphia, Pennsylvania |
| | : September 14, 2004 |
| PHILADELPHIA INTERNATIONAL | : 3:07 o'clock p.m. |
| RECORDS, et al., | : |
| Defendants | : |

. . . . . . . . . . . . . . .

HEARING
BEFORE THE HONORABLE NORMA L. SHAPIRO
UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Plaintiffs:    CHARLES J. GRANT, ESQUIRE
ANN C. LEBOWITZ, ESQUIRE
Grant & Lebowitz, LLC
1818 Market Street, 33rd Floor
Philadelphia, PA    19103

For the Defendants:    DENIS JAMES LAWLER, ESQUIRE
Blank Rome LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA    19103

OREN J. WARSHAVSKY, ESQUIRE
Gibbons DelDeo Dolan
Griffinger & Vecchione, PC
One Pennsylvania Plaza, 37th Floor
New York, NY    10119

- - -

Audio Operator:    Ann Fuhrman

Transcribed by:    Paula L. Curran, CET
Tracey J. Williams, CET
Laws Transcription Service

(Proceedings recorded by For the Record Gold digital sound recording; transcript provided by AAERT-certified transcribers.)

Laws Transcription Service
48 W. La Crosse Avenue
Lansdowne, PA 19050
(610) 623-4178

American Association of
Electronic Reporters & Transcribers, Inc.

1  the present time you know you will use at trial?

2          MR. GRANT:  We have produced documents that we don't

3  even intend to use, your Honor.

4          THE COURT:  All right.

5          MR. GRANT:  We have given them virtually every piece

6  of paper we have, notwithstanding the objections we already

7  made; after the objections, we still gave them everything.

8          THE COURT:  Well, I'll have to look at the -- read

9  me the objections one-by-one.

10         MR. WARSHAVSKY:  Well, a lot of the documents came

11  in this afternoon.  We got I guess two bankers' boxes --

12         THE COURT:  If you wish to file a motion to compel,

13  I will entertain it --

14         MR. WARSHAVSKY:  Okay.

15         THE COURT:  -- but essentially you have to produce

16  all the documents you have.

17         MR. WARSHAVSKY:  And if counsel is going to say that

18  we have everything now, I'm willing to move off document

19  requests.

20         THE COURT:  You have to put that in a letter, if

21  it's true.

22         MR. GRANT:  I'll say that in a letter, I'll say it

23  on the record --

24         THE COURT:  Very well.

25         MR. GRANT:  -- they have everything we have.

1     MR. WARSHAVSKY:  Okay.

2     THE COURT:  All right.  So that --

3     MR. GRANT:  And we're continuing to look though,

4  because there are documents in Las Vegas, Cleveland,

5  Washington, DC, and we're going through all of these in an

6  attempt --

7     THE COURT:  Good, that's your obligation.

8     MR. GRANT:  That's right.

9     THE COURT:  Now, what about interrogatories, have

10  you served interrogatories?

11     MR. WARSHAVSKY:  We did, your Honor.

12     THE COURT:  And have they answered them?

13     MR. WARSHAVSKY:  They have answered some.  There

14  were some that were objected to on the grounds that they were

15  contention interrogatories and --

16     THE COURT:  Well, I don't require -- if you have an

17  interrogatory that says in Paragraph 137 you said, list every

18  witness who is going to support that and everything they're

19  going to say, list every document, I don't enforce that.  I

20  mean, I have seen them and they're improper, as far as I'm

21  concerned, at this stage.  At the conclusion of discovery,

22  the final pretrial memos will take care of the contention

23  interrogatories.

24     MR. WARSHAVSKY:  Okay.

25     THE COURT:  They may be standard interrogatories you

# EXHIBIT "C"

ORIGINAL

```
 1        IN THE UNITED STATES DISTRICT COURT
 2    FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                    -   -   -
 4   EDDIE LEVERT,              :   CIVIL ACTION
     WALTER WILLIAMS,           :
 5   d/b/a as THE O'JAYS        :
                                :
 6              V.              :
                                :
 7   PHILADELPHIA               :
     INTERNATIONAL RECORDS,     :
 8   ASSORTED MUSIC, INC.,      :
     GAMBLE-HUFF PRODUCTIONS,   :
 9   KENNETH GAMBLE, CHUCK      :
     GAMBLE and LEON HUFF       :
10   and THE RIGHT STUFF/       :
     A DIVISION OF CAPITOL      :   NO.
11   RECORDS, INC.              :   04-1489
12                    -   -   -
13              September 30, 2004
14                    -   -   -
15              Oral deposition of WALTER
     LEE WILLIAMS held in the offices of BLANK
16   ROME, LLP, One Logan Square,
     Philadelphia, Pennsylvania 19103
17   commencing at 10:08 a.m., on the above
     date, before Linda Rossi Rios, a
18   Federally Approved Registered
     Professional Reporter and Notary Public
19   of the Commonwealth of Pennsylvania.
                      -   -   -
20
21
22          ESQUIRE DEPOSITION SERVICES
            1880 John F. Kennedy Boulevard
23                   15th Floor
            Philadelphia, Pennsylvania 19103
24                 (215) 988-9191
```

1    records, and they didn't manufacture them

2    then, in my opinion, from the way your

3    definition just described it.  But they

4    did have a hand in those records hitting

5    the marketplace.

6           Q.    Are you aware of Capitol

7    Records ever issuing a license to anybody

8    for the song Don't Walk -- for the

9    composition "Don't Walk Away Mad"?

10          A.    I wouldn't be privy to that.

11          Q.    Are you aware at any point

12   in time where any of the other

13   defendants, and by that I mean Assorted

14   Music, Inc., Gamble-Huff Productions,

15   Inc., Kenneth Gamble, Chuck Gamble, Leon

16   Huff, issued a license for the

17   composition "Don't Walk Away Mad"?

18          A.    I'm not aware.

19          Q.    Going forward, to make it

20   easier, with your counsel's approval, I

21   would like to call Kenneth Gamble, Chuck

22   Gamble, Leon Huff, Assorted Music, Inc.,

23   and Gamble-Huff Productions, Inc. as the

24   PIR defendants.

1    MR. GRANT:  What about

2    Gamble-Huff Productions, no Inc.?

3    MR. WARSHAVSKY:  Okay.  And

4    Gamble-Huff Productions, no Inc.,

5    as the PIR defendants.

6    MR. GRANT:  That's fine.

7    What he's saying, excluding

8    Capitol, when he refers to the PIR

9    defendants, that's who he is

10   talking about it, Assorted Music,

11   Kenneth Gamble, Leon Huff,

12   Gamble-Huff Productions,

13   Gamble-Huff Productions, Inc.,

14   that includes everybody except

15   Capitol.  So when he says PIR

16   defendants, he means everybody but

17   Capitol.

18 BY MR. WARSHAVSKY:

19   Q.    So I don't have to ask

20 questions repeatedly if the answer is

21 going to be yes or no across the board.

22   A.    Okay.

23   Q.    Are you aware of any time in

24 the last six years where the PIR

BY MR. WARSHAVSKY:

Q.     Outside of those two songs, for all the others, are you familiar with any instance over the last six years where Capitol released product with those compositions on them?

A.     I'm not aware.

Q.     Over the last six years, for all of these compositions, are you aware of any instance where Capitol issued a license for these compositions?

A.     I'm not aware.

Q.     For all of these compositions, are you aware of any time any -- start again.

Over the last six years, are you aware of any instance where the PIR defendants have manufactured or released a product with any of these compositions?

A.     I'm not aware.

Q.     Over the last six years, are you aware of any instance where the PIR defendants have issued a license for any of these compositions?

1      A.      I'm not aware.

2      Q.      Speaking generally about

3  these compositions, are you aware of any

4  use of these compositions at all over the

5  last six years?  By that I mean

6  compilations, reissues, any type of audio

7  products which I call records, but audio

8  products I guess could be CDs, cassettes,

9  some people don't like to use records.

10  Any type of audio products, any type of

11  commercials, movies, TV shows?

12      A.      I'm not aware.

13      Q.      Do you have any

14  understanding of whether or not you had

15  any type of agreement as to how

16  compositions written by you were to be

17  owned under the 1977 and 1979 contracts

18  that we looked at?

19      A.      Yeah, I have an

20  understanding of it.  If I wrote it, it

21  belongs to me.  We were approached by

22  Gamble and Huff and even I believe a

23  document was drawn up, we never signed

24  it.  It wasn't saying the right thing.

# EXHIBIT "D"

1   IN THE UNITED STATES DISTRICT COURT
2    FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3              -   -   -
4   EDDIE LEVERT,                    :    CIVIL ACTION
    WALTER WILLIAMS,                 :
5   d/b/a as THE O'JAYS              :
                                     :
6           V.                       :    COPY
                                     :
7   PHILADELPHIA                     :
    INTERNATIONAL RECORDS,           :
8   ASSORTED MUSIC, INC.,            :
    GAMBLE-HUFF PRODUCTIONS,         :
9   KENNETH GAMBLE, CHUCK            :
    GAMBLE and LEON HUFF             :
10  and THE RIGHT STUFF/             :
    A DIVISION OF CAPITOL            :    NO.
11  RECORDS, INC.                    :    04-1489
12             -   -   -
13              October 22, 2004
14             -   -   -
15              Oral deposition of CHARLES
    GAMBLE, held in the offices of Grant &
16  Lebowitz, 1818 Market Street,
    Philadelphia, Pennsylvania 19103
17  commencing at 11:40 a.m., on the above
    date, before Linda Rossi Rios, a
18  Federally Approved Registered
    Professional Reporter and Notary Public
19  of the Commonwealth of Pennsylvania.
               -   -   -
20
21
22          ESQUIRE DEPOSITION SERVICES
            1880 John F. Kennedy Boulevard
23                  15th Floor
            Philadelphia, Pennsylvania 19103
24                (215) 988-9191

1          MR. LAWLER: Objection.

2          THE WITNESS: So yes, it is

3      my understanding.

4  BY MS. LEBOWITZ:

5          Q.    Tell me again what your

6  position is at Philadelphia International

7  Records?

8          MR. WARSHAVSKY: Objection.

9      Asked and answered. Go ahead.

10  BY MS. LEBOWITZ:

11          Q.    You can answer.

12          A.    Executive vice president.

13          Q.    Thank you, Mr. Gamble.

14          Do you know how many master

15  recordings have been licensed, how many

16  master recordings of the O'Jays have been

17  licensed that appear on compilations?

18          A.    No.

19          Q.    Do you know how many master

20  recordings have been licensed?

21          A.    No.

22          Q.    Are the O'Jays being paid

23  royalties on compilations?

24          A.    To my knowledge, the O'Jays

# EXHIBIT "E"

*See next*
*Agreement*
*dated Aug 25, 1975*

As of January 15, 1972

Messrs. Walter Williams,
Eddie Levert & William Powell
p/k/a "The O'Jays"
c/o Walter Williams
20000 Rockside Road
Bedford, Ohio

*3949 Wallace Road*
*Shaker Heights Ohio*
*(44124)*

Dear Sirs:

The following, when signed by you and us, will constitute the agreement between you and us, pursuant to which you will perform exclusively for us as a recording artist, upon the terms and conditions herein set forth:

1. This agreement shall commence as of the date January 15, 1972 and shall continue in force for a term which shall consist of an initial period of one (1) year from such date, and the additional period or periods, if any, by which such term may be extended through our exercise of one or more of the options granted to us herein.

2. During the term of this agreement, you will render your services at recording sessions at studios selected by us, at times and places to be designated by us, for the purpose of making phonograph records. The musical compositions to be recorded shall be designated by us, and each master recording made hereunder shall be subject to our approval as satisfactory for the manufacture and sale of records. During the initial period of the term hereof, you will perform for the recording of satisfactory master recordings which shall consist of a minimum of eight (8) 45 r.p.m. sides, or their equivalent, and we will record your performances. Additional master recordings shall be performed by you and recorded by us at our election.

3.  During the term of this agreement you will not perform for the purpose of making phonograph records or master recordings for any person other than us, and during a period of five (5) years after the expiration of the term of this agreement, for any reason whatsoever, you will not perform any musical composition which shall have been recorded hereunder for any person other than us for the purpose of making phonograph records or master recordings. It is agreed between you and us that your services to be rendered hereunder are of a special, unique, unusual, extraordinary and intellectual character, involving skill of the highest order, which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated by damages in an action at law, and that your breach of any of the provisions contained in this agreement shall cause us irreparable damage and injury. You hereby expressly agree that we will be entitled to injunctive relief and other equitable relief to prevent or cure any breach or threatened breach of this agreement by you.

4.  All master recordings recorded hereunder and all matrices and phonograph records manufactured therefrom, together with the performances embodied thereon, shall be entirely our property, free from any claims whatsoever by you or any person deriving any rights or interests from you. Without limiting the generality of the foregoing, we and/or our subsidiaries, affiliates and licensees shall have the unlimited right, from time to time, to manufacture by any method now or hereafter known phonograph records and other reproductions on any mediums or devices now or hereafter known, of the master recordings made hereunder, and to sell, transfer or otherwise deal in the same throughout the world under any trademark, trade name and label, or to refrain from such manufacture, sale and dealing.

5.  At our election, all compositions recorded pursuant to this or any other agreement between you and us which are written or composed by you or owned or controlled by you or any party which is allied or affiliated with you or in which you have a direct or indirect interest, shall be licensed to us at a royalty rate of 1=1/2 2¢ cents per 45 r.p.m. record side, or its equivalent, on the basis of Ninety (90%) Per Cent of net sales of records, except that (i) with respect to records sold

and/or distributed as "bonus" or "free" records through any "Club
Operation" (as defined in sub-paragraph 8 (b) of this agreement),
the royalty rate shall be three-fourths (3/4ths) of the rate set
forth above, payable on the basis of Ninety (90%) Per Cent of net
sales of records; and (ii) no copyright royalties shall be pay-
able with respect to records described in sub-paragraph 8 (5)
hereof. Arranged versions of musical compositions in the public
domain, when furnished by you or any party described above for
recordings hereunder, shall be free of copyright royalties. Any
assignment made of the ownership or copyright in any such compo-
sition or in any such arranged version of a musical composition
in the public domain shall be made subject to the provisions
hereof. In the event we are required to pay mechanical copyright
royalties in excess of those provided in this Paragraph 5, we
shall have the right to charge such excess against all royalties
or other sums payable to you hereunder.

6. (a) For your services rendered hereunder, and for
the rights granted herein to us, we will make a non-returnable
payment to you, Within Fourteen (14) days after the services are
rendered at each recording session, at the rate of union scale;
and each such payment shall constitute an advance and shall be
charged against your royalties under this and/or any other
agreement between you and us, if and when earned. Without
limiting the generality of the foregoing, included among pay-
ments which shall hereunder constitute advances chargeable
against royalties shall be all amounts which are paid by us pur-
suant to the requirements of any collective bargaining agreement
between us and any union representing you for performances
hereunder.

(b) We shall specify your accompaniment (instru-
mental and vocal), arrangements and copying and studio charges
and/or rentals in respect of master recordings made hereunder,
and we shall pay the costs of such accompaniment as well as the
costs of such arrangements and copying and studio charges and/or
rentals which are specifically undertaken in respect of such
master recordings (such costs are hereinafter collectively re-
ferred to as "Accompaniment Costs"); and all such Accompaniment
Costs so paid by us shall constitute advances and shall be
charged against your royalties earned. Without limiting the
generality of the foregoing, included among Accompaniment Costs

which shall hereunder constitute advances chargeable against royalties, shall be all amounts which are paid by us pursuant to the requirements of any collective bargaining agreements between us and any union representing other persons who render services hereunder or in connection with any accompaniment (instrumental and vocal), arrangements and copying and studio charges and/or rentals for performances hereunder.

7. (a) We will pay you a basic royalty of (i) Ten (10%) Per Cent of the applicable wholesale price (less all taxes) in respect of Ninety (90%) Per Cent of all phonograph records consisting entirely on both sides thereof of a composition or compositions performed by you and recorded hereunder, manufactured and sold by us or by any subsidiary, affiliate or licensee to whom we have supplied a copy or duplicate of a master or a matrix of or embodying such composition or compositions; and (ii) one-half (½) of such percentage of the applicable wholesale price (less all taxes) in respect of Ninety (90%) Per Cent of all phonograph records consisting entirely of such composition or compositions on only one side thereof, so manufactured and sold. In computing the number of records manufactured and sold hereunder, we shall have the right to deduct returns and credits of any nature, including, without limitation, those on account of One Hundred (100%) Per Cent return privileges, defective merchandise, exchange privilege, promotional credits, error in billing, usable overstock and error in shipment.

(b) Royalties for records sold for distribution outside of the United States of America shall be computed in the national currency, at our election, of the country of manufacture, the country of sale of the United States of America, and as to sales made for distribution outside of the United States of America, shall be paid at the same rate of exchange as we are paid; provided, however, that royalties on records sold for distribution outside of the United States of America shall not be due and payable until payment therefor has been received by us in the United States of America, and provided further, that if we do not receive payment in United States dollars currently and elect to accept payment in a foreign currency, we may deposit to your account (and at your expense) in such currency in a depository selected by us, all payments so received as royalties applicable to this agreement, and shall notify you thereof promptly. Such deposit, as above stated, shall fulfill our obligation hereunder

...as to record sales to which such royalty payments are applicable.

(c) With respect to any master recording embodying your performance hereunder, together with the performance of another artist or artists to whom we are obligated to pay royalties in respect of phonograph records, embodying the joint performances contained on such master recording:

(i) the royalty rate to be used in determining the royalties payable to you in respect of such master recording shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one and the denominator of which shall be the total number of royalty artists whose performances are embedded on such master recording; and

(ii) in determining the portion of the accompaniment costs applicable to such master recording which shall be charged against your royalties if and when earned, such portion shall be computed by multiplying the aggregate amount of such Accompaniment Costs by the same fraction used in determining the royalties payable to you in respect of such master recording.

(d) With respect to a side of a long-playing (33-1/3 r.p.m.) or extended-play microgroove record, which embodies on such side performances contained on another master recording(s) in addition to the performances contained on a master recording(s) recorded hereunder, the royalty payable to you in respect of such record side shall be computed by basing the rate provided in sub-paragraph 7(a) (ii) (or other applicable rate) upon that proportion of the applicable wholesale price (less all taxes) of such record that the number of 45 r.p.m. sides required to embody your performances recorded hereunder on such record side bears to the total number of 45 r.p.m. sides required to embody the total number of performances on such record side.

(e) With respect to all phonograph records sold hereunder, royalties on phonograph records included in albums, jackets, cartridges, cassettes, boxes or any other type of package or container (herein collectively referred to as "container(s)") shall be

based solely upon the applicable wholesale price of such phonograph records in containers less all taxes and also less a container charge not to exceed Ten (10%) Per Cent of the applicable price of disc phonograph records and Twenty-five (25%) Percent with respect to all other forms of records, as such wholesale price is defined in sub-paragraph (e) (i) or (e) (ii), as the case may be, of Paragraph 16 hereof.

8. Notwithstanding anything to the contrary contained in this or any other agreement between you and us, the following shall apply with respect to phonograph records manufactured pursuant to this or any other such agreement and sold and/or distributed in the manner set forth hereinbelow.

(a) In respect of phonograph records sold for distribution outside of the United States of America, the royalty rate payable to you therefor shall be equal to one-half (½) of the applicable royalty rate which would have been payable to you therefor if such records had been sold for distribution in the United States of America.

(b) In respect of phonograph records sold through any direct mail order operation or through any direct sales-to-consumer operation carried on by us, our subsidiaries, affiliates or licensees, including, without limitation, any Record or Tape Club (herein collectively referred to as "Club Operation"), the royalty rate shall be one-half (½) of the otherwise applicable royalty rate. Notwithstanding the preceding sentence, if such phonograph records are sold through any such Club Operation at a price (excluding postage and handling charges) of One ($1.00) Dollar or less, the royalty rate payable to you in respect of such phonograph records if they had been sold through such Club Operation at a price of more than One ($1.00) Dollar and, notwithstanding anything to the contrary contained in this agreement, such royalty rate shall be computed on the basis of the actual sales price charged by such Club Operation for such phonograph records (excluding postage and handling charges). Notwithstanding anything contained in the foregoing two sentences or elsewhere in this agreement, no royalty shall be payable to you with respect to: (i) phonograph records which are received

by members of any such Club Operation, either in an introductory offer in connection with such Club Operation or upon recommendation that another join such Club Operation and/or as a result of the purchase of a required number of records, including, without limitation, records distributed as "bonus" and/or "free" records, or (ii) phonograph records for which such Club Operation is not paid.

(c) In respect of phonograph records sold to our clients for promotional, sales incentives or educational purposes or phonograph records sold to educational institutions or like, the royalty rate payable to you therefor shall be one-half (1/2) the royalty rate otherwise payable and shall be computed on the basis royalty rate otherwise payable and shall be computed on the basis of the actual sales price therefor (less all taxes and container charges) to any of the foregoing.

(d) In respect of phonograph records sold in the form of pre-recorded tape, the royalty rate payable to you therefor shall be one-half (1/2) of the applicable royalty rate otherwise payable if such record(s) were sold in disc form.

(e) In respect of phonograph records sold on a "low price" or "budget" label, the royalty rate shall be one-half (1/2) applicable rate otherwise payable.

(f) No royalty shall be payable to you in respect of phonograph records sold as "cut-outs" after the listing of such records has been deleted from our catalog or in respect of phonograph records distributed as "free" or "no-charge" records or records sold and/or distributed to radio stations or for use on transportation facilities to promote or stimulate the sale of phonograph records embodying your performances.

9. In respect of the royalties provided for herein:

(a) We will compute royalties payable to you hereunder within sixty (60) days after June 30 and after December 31 of each year during which records made hereunder are sold for the preceding six (6)-month period, and will render accountings for / pay such royalties, less any unrecouped advances under this and/or any other agreement between you and us, within such sixty (60) days, except as provided in sub-paragraph 7(b) hereof, and except with respect to sales of records upon which royalties are payable to us by a distributor thereof. We shall be responsible for payment of your royalties on such sales only after receipt by us from such distributor of the royalties applicable to such sales.

(b) All royalty statements and all other accounts rendered by us to you hereunder shall be binding upon you and not subject to any objection by you for any reason whatsoever unless specific objection in writing, stating the basis thereof, is given to us within six (6) months from the date rendered. Notwithstanding anything to the contrary contained herein, we shall be under no obligation to account to you in respect of, and/or pay to you, sums of Fifty ($50.00) Dollars or less, unless we receive a written demand from you for such an accounting and payment.

10. (a) We shall have the right to use and to allow others to use your name and likeness and biographical material concerning you for advertising and purposes of trade, and otherwise without restriction, in connection with the phonograph records made pursuant to this agreement and in advertisements for our company, its artists and products. We shall not use or authorize any direct endorsement by you of any record or performance without your prior written consent. During the term of this agreement, you shall not endorse or authorize your name or likeness to be used in connection with the advertising or sale of products in the same category as those which are currently manufactured and sold by or for us.

(b) Without limiting the provisions of sub-paragraph 10(a) hereof, you hereby grant to us, during the term of this agreement, the exclusive right, throughout the world, to authorize the use of your name and/or likeness and/or biographical material concerning you, whether alone or in conjunction with other elements, in connection with the sale, lease, license or other disposition (herein collectively referred to as "sale(s)") of merchandising rights and to enter into agreements covering such sales. It is expressly understood and agreed that any contract entered into by us for such a sale during the term of this agreement shall continue in full force and effect in accordance with the provisions thereof, but after the termination of the term of this agreement, we shall have no right to enter into a new contract to make any new sale authorizing the use of your name and/or likeness after the termination of the term of this agreement. For the rights granted by this sub-paragraph we will pay you, in United States dollars, Fifty (50%) Per Cent of the net monies earned and received by us in the United States of America from such sales of merchandising rights authorizing the use of your name and/or likeness and/or biographical material concerning you pursuant to this agreement.

(c) You warrant and represent that you own all rights in and to the name "THE O'JAYS" (hereinafter referred to as the "Name"), and that you have the sole and exclusive right to use and to allow others to use the Name in connection with the manufacture, advertising and sale of phonograph records. You hereby grant to us, and further warrant and represent, that we shall have the right to use and to allow others to use the Name for advertising and purposes of trade and otherwise without restriction in connection with the phonograph records made pursuant to this agreement and in advertisements for our company, its artist and products and exclusively in connection with the merchandising rights to the same extent and on the same terms and conditions as set forth herein with respect to your names. It is understood and agreed that (i) during the term of this agreement you will not authorize or knowingly permit any performance by any person or persons who shall in any way be identified with the Name (or any name substantially similar thereto) for the purpose of making phonograph records for any person other than us, and (ii) during a period of five (5) years after the expiration of the term of this agreement, for any reason whatsoever, you will not authorize or knowingly permit the performance by any person or persons who shall in any way be identified with the Name (or any name substantially similar thereto) of any compositions recorded hereunder for any person other than us for the purpose of making phonograph records. It is further understood and agreed that you will not at any time manufacture, distribute or sell or authorize or knowingly permit the manufacture, distribution or sale by any person other than us of phonograph records embodying (i) the performances by any person or persons rendered during the term of this agreement, or (ii) the performance by any person or persons of a composition recorded hereunder rendered within five (5) years after the expiration of the term of this agreement, which phonograph records and/or performances shall in any way be identified with the Name or any name substantially similar thereto. You acknowledge that any use of the Name (or any name substantially similar thereto) contrary to the provisions hereof would cause us irreparable injury, and you agree to use your best efforts in assisting us to prevent any such use.

(d) In the event that during the term of this agreement any artist shall leave the group hereunder identified with the Name and/or shall cease to perform as a member of such group, you shall promptly give us notice in writing to such effect and in the event we shall deem it advisable, such leaving member shall be replaced by a new member who shall be mutually acceptable; and the

name of such new member shall thereafter be deemed substituted in
this agreement for ... ... of such leaving member, and such new
member, by performing hereunder, shall automatically be bound by
all the terms and conditions of this agreement. Upon our request
therefor, the remaining members of the group will duly cause any
such new member to execute and deliver to us such document as we,
in our judgment, may deem necessary or expedient to carry out or
in our judgment, may deem necessary or expedient to carry out or
effectuate the purpose or intent of the foregoing sentence. Such
leaving member shall thereafter be relieved from further perform-
ances hereunder with the group, but shall continue to be bound
individually by the applicable provisions of this agreement in-
cluding, without limitation, the provisions set forth in sub-
paragraphs 10(e) and 3 hereof.

(e) You warrant and represent that, in the event
any one or more of the artists shall so leave the group as pro-
vided in sub-paragraph 10(d) hereof, we shall have, and you and
each of you does hereby grant to us, and irrevocable option on
your individual and exclusive services for the purpose of making
phonograph records. Such option, with respect to any such leav-
ing member, may be exercised by us by giving such leaving member
notice in writing within ninety (90) days after our receipt of
the notice provided for in said sub-paragraph 10(d); and, in the
event of our such exercise of option, such leaving member shall
execute our then current standard form of term recording contract
containing the following provisions:

(i) a term consisting of not less than the
remaining balance of the term of this agreement as it may be ex-
tended by our exercise of the options granted to us herein;

(ii) a minimum of eight (8) 45 r.p.m.
record sides or their equivalent for which satisfactory master re-
cordings will be performed and recorded during each year of such
term, it being understood and agreed that if the remaining balance
of the term of this agreement shall be less than six (6) months,
then the minimum number of such 45 r.p.m. record sides for which
master recordings will be performed and recorded during such re-
maining balance of the term shall be one-half (½) of the foregoing
number;

(iii) a royalty in respect of phonograph re-
cords embodying performances recorded during such term at the rate
set forth in Paragraphs 7 and 8 of this agreement; and

(c)  You warrant and represent that you own all rights in and to the name "THE O'JAYS" (hereinafter referred to as the "Name"), and that you have the sole and exclusive right to use and to allow others to use the Name in connection with the manufacture, advertising and sale of phonograph records.  You hereby grant to us, and further warrant and represent, that we shall have the right to use and to allow others to use the Name for advertising and purposes of trade and otherwise without restriction in connection with the phonograph records made pursuant to this agreement and in advertisements for our company,  its artist and products and exclusively in connection with the merchandising rights to the same extent and on the same terms and conditions as set forth herein with respect to your names.  It is understood and agreed that (i)  during the term of this agreement you will not authorize or knowingly permit any performance by any person or persons who shall in any way be identified with the Name (or any name substantially similar thereto) for the purpose of making phonograph records for any person other than us, and (ii)  during a period of five (5) years after the expiration of the term of this agreement, for any reason whatsoever, you will not authorize or knowingly permit the performance by any person or persons who shall in any way be identified with the Name (or any name substantially similar thereto) of any compositions recorded hereunder for any person other than us for the purpose of making phonograph records.  It is further understood and agreed that you will not at any time manufacture, distribute or sell or authorize or knowingly permit the manufacture, distribution or sale by any person other than us of phonograph records embodying (i)  the performances by any person or persons rendered during the term of this agreement, or (ii)  the performance by any person or persons of a composition recorded hereunder rendered within five (5) years after the expiration of the term of this agreement, which phonograph records and/or performances shall in any way be identified with the Name or any name substantially similar thereto.  You acknowledge that any use of the Name (or any name substantially similar thereto) contrary to the provisions hereof would cause us irreparable injury, and you agree to use your best efforts in assisting us to prevent any such use.

(d)  In the event that during the term of this agreement any artist shall leave the group hereunder identified with the Name and/or shall cease to perform as a member of such group, you shall promptly give us notice in writing to such effect and in the event we shall deem it advisable, such leaving member shall be replaced by a new member who shall be mutually acceptable; and the

name of such new member shall thereafter be deemed substituted in ..... ................. ...... .... .. .... of such leaving member, and such new member, by performing hereunder, shall automatically be bound by all the terms and conditions of this agreement. Upon our request therefor, the remaining members of the group will duly cause any such new member to execute and deliver to us such document as we, in our judgment, may deem necessary or expedient to carry out or effectuate the purpose or intent of the foregoing sentence. Such leaving member shall thereafter be relieved from further performances hereunder with the group, but shall continue to be bound individually by the applicable provisions of this agreement including, without limitation, the provisions set forth in sub-paragraphs 10(e) and 3 hereof.

(e)  You warrant and represent that, in the event any one or more of the artists shall so leave the group as provided in sub-paragraph 10(d) hereof, we shall have, and you and each of you does hereby grant to us, and irrevocable option on your individual and exclusive services for the purpose of making phonograph records. Such option, with respect to any such leaving member, may be exercised by us by giving such leaving member notice in writing within ninety (90) days after our receipt of the notice provided for in said sub-paragraph 10(d); and, in the event of our such exercise of option, such leaving member shall execute our then current standard form of term recording contract containing the following provisions:

(i)  a term consisting of not less than the remaining balance of the term of this agreement as it may be extended by our exercise of the options granted to us herein;

(ii)  a minimum of   eight (8)   45 r.p.m. record sides or their equivalent for which satisfactory master recordings will be performed and recorded during each year of such term, it being understood and agreed that if the remaining balance of the term of this agreement shall be less than six (6) months of the term of this agreement shall be less than six (6) months, then the minimum number of such 45 r.p.m. record sides for which master recordings will be performed and recorded during such remaining balance of the term shall be one-half (½) of the foregoing number;

(iii)  a royalty in respect of phonograph records embodying performances recorded during such term at the rate set forth in Paragraphs 7 and 8 of this agreement; and

(iv)   a payment for services rendered at each recording session at the rate of union scale, which payment shall be ~~~~~~ ~~~~~~ against such royalties.

In the event that during the term of this agreement the group shall completely disband, you shall promptly give us notice in writing to such effect, and, in such event, the provisions of this subparagraph 10(a) shall be applicable with respect to each member of the group.

(f)   As to all matters contained in this agreement to be determined by mutual agreement between you and us, or as to which your approval or consent is required, you shall not unreasonably withhold such agreement, approval or consent.  Your duties, liabilities, obligations, warranties, representations, authorizations and agreements contained in this agreement are joint and several and all references herein to "you" and "your" in connection therewith shall include all of you inclusively and each of you individually, unless otherwise specified.

11.   You will not, at any time, manufacture, distribute or sell or authorize or knowingly permit the manufacture, distribution or sale by any person other than us of phonograph records embodying:

(a)   any performance rendered by you during the term of this agreement; or

(b)   any performance rendered by you within five (5) years after the expiration of the term of this agreement of a composition which shall have been recorded pursuant to this agreement.

You will not record or authorize or knowingly permit to be recorded for any purpose any such performances without in each case taking reasonable measures to prevent the manufacture, distribution and sale at any time by any person other than us of phonograph records embodying such performances.  Specifically, without limiting the generality of the foregoing, you agree:

(a)   if, during the term of this agreement you perform for the purpose of making transcriptions for radio or television or soundtracks for motion picture films; or

(b)   if, within five (5) years after the expiration of the term of this agreement you perform for any such purpose any composition which shall have been recorded pursuant to this agree-

you will do so only pursuant to a written contract containing an express provision that neither such performance nor any recording thereof will be used, directly or indirectly, for purpose of making phonograph records.

You will promptly furnish to us, at our Philadelphia office, a copy of the pertinent provisions of each such contract and will cooperate fully with us in any controversy which may arise or litigation which may be brought relating to our rights under this paragraph.

12. You warrant and represent that you are under no disability, restriction or prohibition in respect of (a) your right to execute this agreement and perform its terms and conditions, and more particularly, (b) your right to perform for the recording of any and all compositions hereunder, except to the extent, if any, set forth in Schedule I attached hereto and made a part hereof. You agree to and do hereby indemnify, save and hold us harmless from loss or damage (including reasonable attorneys fees) arising out of or connected with any claim by a third party which is inconsistent with any of the warranties or representations made by you in this agreement. You will reimburse us on demand in respect any payment made by us at any time after the date hereof in respect of any liability or claim to which the foregoing indemnity relates.

13. We may, at our election, assign this agreement or any of our rights hereunder.

14. (a) You warrant and represent that you are now a member in good standing of the American Federation of Television and Radio Artists, or will become a member within thirty (30) days after your first engagement with us, and that you will remain so during the term of this agreement.

(b) The provisions of the AFTRA National Code of Fair Practice for Phonograph Recordings are made a part of this agreement with the same force and effect as if fully set forth herein.

(c) If, by reason of illness, injury, accident or refusal to work, you fail to perform for us in accordance with the provisions of Paragraph 2 hereof or, if due wholly or partly to any labor controversy or adjustment thereof, or to any other cause not entirely within our control, or which we could not, by reasonable

PIR 929

diligence, have avoided, we are materially hampered in the mak-
ing, manufacture, distribution or sale of records, or our nor-
business operations become commercially impractical, then, with-
limiting our rights in any such event, we shall have the opti-
without liability, to suspend operation of Paragraph 2 and/or
paragraph 9 (a) of this agreement for the duration of any such
tingency by giving you written notice thereof; and at our el-
a period of time equal to the duration of such suspension shall
added at the end of the then current period of the term hereof,
then such period and the term of this agreement shall be accord-
extended.

15. If, during the term of this agreement we fail, ex-
cept for reasons set forth in Paragraph 14 hereof, to record mas-
recordings constituting the minimum number of record sides provid-
for herein and, if within thirty (30) days after the expiration o
the term hereof you shall notify us by registered mail of your re-
quest that we record such of your performances as well as fulfill
our minimum obligation hereunder, then we shall, at our option, w
in sixty (60) days after our receipt of such request, either reco
such performances or pay you at the rate of union scale in full s
element of our obligation in connection therewith. In the event
that you do not so notify us within such thirty (30)-day period,
then we shall be under no obligation to you for failure to record
master recordings constituting such minimum number of record sides.

16. For purposes of this agreement:

(a) "Master recording" means any original recording
whether on magnetic tape or wire, a lacquer or wax disc, or on any
other substance or material, whether now known or unknown, which
is used in the manufacture of phonograph records;

(b) "Matrix" means any dye or mold or device which
is now or hereafter used, directly or indirectly, in the manufac-
ture of phonograph records and which is made from master recording

(c) "Person" or "party" include any individual, cor-
oration, partnership, association or other organized group of per-
sons or legal successors or representatives of the foregoing;

(d) "Records", "phonograph records" and "recordings"
mean and include all forms of recording and reproductions, now kno
or which may hereafter become known, manufactured or sold primaril

for home use and/or jukebox use and/or use on transportation facilities, including, without limiting the generality of the foregoing, magnetic recording tape, film and any other medium or device for the reproduction of artistic performances manufactured or sold prior to for home use and/or jukebox use and/or use on transportation facilities, whether embodying:

(i) sound alone; or

(ii) sound synchronized with visual images, e.g., "sight and sound" devices;

(e) "Wholesale price" means:

(i) With respect to records sold hereunder for distribution in the United States of America, the average net price received from distributors for our phonograph records during the six-month period immediately preceding the applicable accounting period for the computation of the royalties to be made pursuant to sub-paragraph 9 (a) hereof, it being understood that a separate calculation of the average wholesale price shall be made for each price category of phonograph records manufactured and sold by us;

(ii) With respect to records sold hereunder for distribution outside the United States of America, one-half (½) of the suggested retail list price or applicable list price (less container charges and local taxes, if any), as the case may be, of such records in, at our election, the country of manufacture, the United States of America or the country of sale;

(f) "Records sold" shall mean records shipped, paid for and not returned or exchanged. In the event records hereunder are shipped subject to a discount or merchandising plan, the number of records deemed to have been sold shall be determined by reducing the number of records shipped by the percentage of discount granted. In the event a discount is granted in the form of "free" or "bonus" merchandise, such "free" or "bonus" merchandise shall not be deemed merchandise, such "free" or "bonus" merchandise shall not be deemed included in the number of records sold. "Records sold" shall not include records given away or distributed for fifty (50%) per cent or less of the regular wholesale price to distributors or others for promotion or exploitation purposes in connection with the inducement of sale of other records hereunder.

(g) "Merchandising rights" shall mean and include all rights with respect to printed material, endorsements and merchandising of commercial tie-ups, in connection with the manufacture, advertising and sale of physical property, including without limitation, toys, novelties, books, paper cut-outs, activity books, etc.

(h) As used in sub-paragraph 10(b) hereof, "net monies earned and received" shall mean the total amount received by us pursuant to sales (as that term is defined in sub-paragraph 10(b) hereof) of merchandising rights hereunder, after the deduction of all direct costs, expenses and commissions attributable to such sales, and after the deduction of any amounts which we are required to pay, as expenses, commissions or otherwise, to other persons in connection with such sales, all of which are to be computed in accordance with our standard accounting practices and procedures.

(i) As used herein, "low-price" or "budget" label shall mean any label used by us, our subsidiaries, affiliates, distributors or licensees, signifying that the records bearing such label carry a suggested retail list price substantially less than the suggested retail list price for records bearing the standard label or labels used by us, our said subsidiaries, affiliates, distributors and/or licensees.

17. No failure by us to perform hereunder, and no act or failure to act shall be deemed a material breach of this contract unless you shall first deliver to us, and to the record company principally distributing your recordings in the United States, a written notice specifying the alleged failure to perform or the alleged act or alleged failure to act constituting such material breach, and we shall have failed to cure any such material breach within thirty (30) days after receipt by us of such notice from you. In the event we do not cure any such breach within the said thirty (30)-day interval, then it is specifically understood and agreed that this contract may be assigned to the said record and company distributing your recordings in the United States, and such record company shall have an additional thirty (30)-day period to cure the said material breach in such event.

18. Any option to extend the term of this agreement, whereinafter in this agreement granted to us, may be exercised by us by giving you notice in writing at least ten (10) days prior to the expiration of such term. Such notice to you may be given by delivery to you by mailing to you at your address last known to us. Such notice by mail shall be deemed to have been given on the date on which it is mailed.

19. You grant to us the option to extend the term of this agreement for a first additional period of one year upon the terms and conditions herein contained, except that in respect of compositions performed by you and recorded by us during such period, the royalty rate set forth in Paragraph 7(a) hereof shall be Ten (10%) Per Cent in lieu of the rate therein forth, and the minimum number of sides shall be (8).

20. If we have exercised the option granted in Paragraph 19 hereof, we shall have another option to extend the term of this agreement for a second additional period of one year upon all the terms and conditions herein contained, except that in respect of compositions performed by you and recorded by us during such additional period, the royalty rate set forth in Paragraph 7(a) hereof shall be Ten (10%) Per Cent in lieu of the rate therein set forth, and the minimum number of sides shall be (8).

21. If we have exercised the option granted in Paragraph 20 hereof, we shall have another option to extend the term of this agreement for a third additional period of one year upon all the terms and conditions herein contained, except that in respect of compositions performed by you and recorded by us during such additional period, the royalty rate set forth in Paragraph 7(a) hereof shall be Ten (10%) Per Cent in lieu of the rate therein set forth, and the minimum number of sides shall be (8).

22. If we have exercised the option granted in Paragraph 21 hereof, we shall have another option to extend the term of this agreement for a fourth additional period of one year upon all the terms and conditions herein contained, except that in respect of compositions performed by you and recorded by us during such additional period, the royalty rate set forth in Paragraph 7(a) hereof shall be Ten (10%) Per Cent in lieu of the rate therein set forth, and the minimum number of sides shall be (8).

23. We shall have the sole and exclusive control of the distribution of phonograph records produced hereunder and shall have the right to distribute, market and exploit the same directly or through any subsidiary, affiliate or licensee of ours or through any franchise holder, distributor, licensee or other person throughout the world. It is specifically understood and agreed that we have absolute title to all master recordings produced hereunder and all records produced therefrom and that the expiration, suspension or termination of this agreement for any reason shall not affect our ownership thereof, our right to distribute records as herein provided, our right to use your name and likeness as herein provided or the other rights herein granted to us, which shall survive in any event.

24. It is hereby agreed that all royalties due and payable pursuant to this agreement shall be paid to
"THE O'JAYS"
and that payment thereto of such royalties shall discharge our entire royalty obligations to you (and to each member of the Artist if Artist is a recording group). The royalties set forth in Paragraphs 7 and 8 hereof are intended to include provision for all performers rendering services in connection with the master recordings. You hereby indemnify and agree to hold us harmless from any claims for royalties in excess of those herein provided.

25. It is acknowledged and agreed that certain recording costs and advances have not been recouped pursuant to a prior agreement between you and Assorted Music, Inc., dated the 1st day of January, 1971. It is agreed that the amount of such recording costs and/or advances to the extent not recouped pursuant to the said prior agreement shall be deemed an advance against and recoupable from any and all royalties payable pursuant hereto.

26. This agreement sets forth the entire agreement between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement or any other provisions thereof shall be binding upon us unless confirmed by a written instrument signed by an officer of our company. No waiver of any provision of or default under this agreement shall

affect our rights or remedy in the event of any other default, whether
or not similar. The validity, construction and effect of this agree-
ment, and any and all extensions and/or modifications thereof, shall
be governed by the laws of the State of New York.

Very truly yours,

GAMBLE-HUFF PRODUCTIONS, INC.

By _Leon Huff_

ACCEPTED AND AGREED:

_Walter Williams_
Walter Williams

_Eddie Levert_
Eddie Levert

_William Powell_
William Powell
p/k/a "The O'Jays"

## SUPPLEMENTAL AGREEMENT

The following Supplemental Agreement, executed simultaneously
with the foregoing Agreement of January 15, 1972, is hereby incorporated
into and made a part of said Agreement of January 15, 1972, as though
fully rewritten therein. The provisions of this Supplemental Agree-
ment, where inconsistent with the provisions of the Agreement of
January 15, 1972, shall take precedence and govern, and shall replace
those provisions of the Agreement of January 15, 1972, agreement which
are inconsistent herewith. The provisions of this Supplemental Agree-
ment shall, therefore supersede all inconsistent provisions of the
January 15, 1972 Agreement:

A)   Mr. Gamble or Mr. Huff shall preside at all recording sessions.
In the event neither of these individuals is able to preside at
any recording session, or fails or refuses to preside at any
recording session, the parties to this contract shall designate
an individual or individuals mutually acceptable to all parties, who
shall preside.

(Continued on Page 20)

B) We shall pay your transportation from Cleveland, Ohio, to Philadelphia, Pennsylvania, and back to Cleveland, Ohio for each recording session, together with the cost of hotel accommodations (including any hotel room tax, but excluding meals and all other charges) in Philadelphia, Pennsylvania, when you are required to stay in Philadelphia overnight due to recording schedules. These sums shall be included within the definition of "Accompaniment Costs" in paragraph 6 (b) above and shall be charged against your royalties earned in the same manner as the other accompaniment costs specified in paragraph 6(b).

C) It is expressly understood by and between the parties that the provisions of paragraph 5 above, under the terms of which you have agreed to license to us certain compositions. are applicable only with respect to ~~~~~~ as defined by paragraph 16 (b)) manufactured pursuant to this agreement, and that you retain all right, title, and interest to your compositions and retain the exclusive right to sell or license them to anyone.

D) You shall have the unlimited right to inspect our books and records, insofar as such books and records pertain to any monies and royalties payable to you hereunder or any other matters pertaining to you. Such inspection may be had by you upon seven days written notice to us and shall take place during usual business hours. Such inspection shall be by an accountant certified by any state, or by an attorney. Such unlimited right of inspection shall not terminate at the end of this contract, but shall continue in full force and effect so long as any of the recordings specified herein are marketed. If we do not allow such inspection or in any manner hinder the right to inspect said books during the term of this agreement, then you shall have the option, in addition to any other right you have at law or equity, to void and terminate this agreement without any liability or obligation whatsoever to us, with us still being responsible and liable for our duties under this agreement. Notice of such termination shall be by certified mail sent to us at the address specified herein.

E) Paragraph 10 (b), paragraph 16 (g), and paragraph 16 (h) are hereby deleted from the above agreement and are void and of no effect.

F) Paragraph 10 (e) of the above agreement is hereby deleted and replaced by the following new paragraph 10 (e)·(e):

"You warrant and represent that in the event any one or more of the artists shall so leave the group as provided in sub-paragraph 10 (d) hereof, we shall have, and you and each of you does hereby grant to us, an irrevocable

PIR 936

right of first refusal on your individual and exclusive
services for the purpose of making phonograph records.
With respect to such leaving member, we shall have a
right to meet any bona fide contract offer made to him
upon the same terms and conditions contained in such bona
fide offer, and in the event we elect to meet the terms
and conditions of such bona fide contract offer, the leav-
ing member shall be required, with the written approval
of Prime Enterprises, Inc., (which shall be a signatory
to any and all agreements between you and us) to execute
our current standard form of term recording contract con-
taining the terms and conditions specified in such bona
fide offer. Such option with respect to any such leaving
member may be exercised by us by giving such leaving member
notice in writing within ninety days after our receipt of
the notice provided for in sub-paragraph 10 (d). Subject
to the foregoing, the leaving member shall exercise our
then current standard form of term recording contract con-
taining the following provisions: . . ."

G) With respect to paragraph 10(f) above, the third
line of such paragraph shall be amended to read as follows:

". . . which the approval of either party or consent of either
party is required, neither party shall unreasonably . . ."

H) The last full sub-paragraph of paragraph 11
above, which reads as follows:

"You will promptly furnish to us at our Philadelphia
office a copy of the pertinent provisions of each such contract and
will cooperate fully with us in any controversy which may arise or
litigation which may be brought relating to our rights under this
paragraph . . ." is hereby amended to read as follows:

"You will cooperate fully with us in any controversy which
may arise and litigation which may be brought relating
to our rights under this paragraph."

Furthermore, nothing in paragraph 11 above shall require you to ex-
pend any funds to commence or undertake litigation or to perform
any obligation imposed upon you in paragraph 11.

I) With respect to the option given to us in para-
graph 19 above, said option is conditioned upon and may only be
exercised in the event record sales during the original term of this
contract total 750,000 units (defining a single record as one unit
and an LP as 4 units).

J) With respect to the option granted us in para-
graph 20 above, said option is conditioned upon and may only be

exercised in the event that the first option has been exercised and in the event that during the first option period contract record sales total 750,000 units (defining a single record as one unit, and an LP as 4 units).

K) With respect to the option granted us in paragraph 21 above, said option is conditioned upon and may only be exercised in the event that the second option has been exercised and in the event that during the second option period, contract record sales total 1,000,000 units (defining a single record as one unit and an LP as 4 units).

L) With respect to the option granted us in paragraph 22 above, said option is conditioned upon and may only be exercised in the event that the third option has been exercised and in the event that during the third option period, contract record sales total 1,000,000 units (defining a single record as one unit and an LP as 4 units).

M) It is expressly agreed that all royalties due and payable pursuant to this agreement shall be paid to "Prime Enterprises, Inc. and the O'Jay's" and shall be sent to 730 Standard Building, Cleveland, Ohio, and paragraph 24 above is hereby amended so to provide.

N) Paragraph 25 above is hereby deleted and is held void and of no effect.

O) Paragraph 26 above is hereby deleted and replaced with a new paragraph 26.1 as follows:

This agreement, together with this supplemental agreement, sets forth the entire agreement between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement or any of the provisions thereof shall be binding upon either party unless confirmed by a written instrument signed by an officer of our company and by each of you, together with Prime Enterprises, Inc. No waiver of any provision of or default under this agreement shall affect any rights or remedy in the event of any other default whether or not similar; the validity, construction and effect of this agreement and any and all extensions or modifications hereof shall be governed by the laws of the State of New York.

Very truly yours,

GAMBLE-HUFF PRODUCTIONS, INC.

ACCEPTED AND AGREED:

_____
Walter Williams

By _____

_____
Eddie Levert

RELEASE DATE

| SELECTION | COMPANY | DATE RECORDED | TYPE OF RESTRICTION | XXXXXXXXXXXXXXX XXXXXXXXXXXXXX |
|---|---|---|---|---|
| A. BACK STABBERS | | P.I.R. | | MAY 1972 |
| B. SUNSHINE | | P.I.R. | | MAY 1972 |
| A. 992 ARGUMENTS | | P.I.R. | | OCT. 72 |
| B. LISTEN TO THE CLOCK ON THE WALL | | P.I.R. | | OCT. 72 |
| A. LOVE TRAIN | | P.I.R. | | NOV. 72 |
| B. WHO AM I | | P.I.R. | | NOV. 72 |

ALBUM TITLE: BACK STABBERS

AUGUST 72

SIDE I

1. BACK STABBERS
2. WHO AM I
3. WHEN THE WORLD IS AT PEACE
4. MR. LUCKY
5. TIME TO GET DOWN

SIDE II

1. 992 ARGUMENTS
2. LISTEN TO THE CLOCK ON THE WALL
3. SHIFTLESS, SHADY, JEALOUS KIND OF PEOPLE
4. SUNSHINE
5. LOVE TRAIN

| | | | |
|---|---|---|---|
| A. TIME TO GET DOWN | P.I.R. | | APRIL 1973 |
| B. SHIFTLESS, SHADY JEALOUS KIND OF PEOPLE | P.I.R. | | APRIL 1973 |

ALBUM TITLE: THE O'JAYS IN PHILADELPHIA

SIDE I
1. ONE NIGHT AFFAIR
2. YOUR THE BEST THING SINCE CANDY
3. BRANDED BAD
4. I SHOULD BE YOUR LOVER
5. LOOKY LOOKY (LOOK AT ME GIRL)

SIDE II
1. DEEPER (IN LOVE WITH YOU)
2. LET ME IN YOUR WORLD
3. JUST CAN'T GET ENOUGH
4. I'VE GOT THE GROVE
5. MEDLEY: LITTLE GREEN APPLES, SOMETHING
6. IT'S TOO STRONG

RELEASED APRIL 1973

| SELECTION | COMPANY | DATE RECORDED | TYPE OF RESTRICTION | EXPIRATION OF RESTRICTION |
|---|---|---|---|---|

ALBUM TITLE: THE O'JAYS _ SHIP AHOY
ALBUM NUMBER: KZ32408

**SIDE I**
1. PUT YOUR HANDS TOGETHER
2. SHIP AHOY
3. THIS AIR I BREATH
4. YOU GOT YOUR HOOKS IN ME

RELEASED: October 1973

**SIDE II**
1. FOR THE LOVE OF MONEY
2. NOW THAT WE FOUND LOVE
3. DON'T CALL ME BROTHER
4. PEOPLE KEEP TELLIN' ME

Produced: Gamble-Huff

---

A. CHRISTMAS AIN'T CHRISTMAS NEW YEARS AIN'T NEW YEARS WITH OUT THE ONE YOU LOVE — P.I.R. — NOVEMBER 1973

B. JUST CAN'T GET ENOUGH — P.I.R. — NOVEMBER 1973

---

A. PUT YOUR HANDS TOGETHER — P.I.R. — NOVEMBER 1973
B. YOU GOT YOUR HOOKS IN ME — P.I.R. — NOVEMBER 1973

---

A. FOR THE LOVE OF MONEY — P.I.R. — MARCH 1974
B. PEOPLE KEEP TELLING ME — P.I.R. — MARCH 1974

---

ALBUM   O'JAYS LIVE IN LONDON — P.I.R — MAY 1974

**SIDE ONE**
1. INSTRUMENTAL INTRO.
2. PUT YOUR HANDS TOGETHER
3. WILDFLOWER

**SIDE TWO**
1. BACKSTABBERS VOCAL INTRO.
2. SUNSHINE
3. LOVE TRAIN

PRODUCER:  BOBBY MARTIN

---

A. SUNSHINE (PT II) — P.I.R — BOBBY MARTIN PROD. 10/74
B. SUNSHINE (PT I )

---

A. CHRISTMAS AIN'T CHRISTMAS W/OUT THE ONE YOU LOVE — P.I.R — 12/74
B. JUST CAN'T GET ENOUGH — PAKULA/SERLEN PRODUCERS

---

A. GIVE THE PEOPLE WHAT THEY WANT — P.I.R — G-H — PRODUCER — 4/3/7