# EXHIBIT "F"

GAMBLE-HUFF PRODUCTIONS, INC.
309 South Broad Street
Philadelphia, Pennsylvania 19107

As of August 26, 1975

Messrs. Walter Williams,
Eddie Levert & William Powell
c/o Walter Williams
3569 Winchell Road
Shaker Heights, Ohio 44120

Gentlemen:

Reference is made to the agreement between us dated As of January 15, 1972, as such agreement may have heretofore been supplemented and/or modified (the "Agreement") and specifically the modification agreement relating thereto dated August 25, 1975 (the "Modification"). The following when executed by you and by us will constitute a further modification of the Agreement.

1.    With respect to the payments to be made to you pursuant to subparagraph 4.a) of the Modification, it is agreed that any royalties payable to you pursuant to the Agreement during any royalty accounting period, in respect of sales made from and after July 1, 1975, in excess of advances recoupable therefrom, shall be in reduction of any such subparagraph 4.a) payment(s) as may remain to be made.

2.    You agree that you shall notify us and CBS Records, a division of CBS Inc. by certified mail (return receipt requested) of any future claim by you that we have breached the Agreement to an extent which you would consider sufficiently material to permit you to terminate the term thereof, and in the event we fail to cure such breach within thirty (30) days from the date of your such notice, you shall not proceed to terminate the term of such agreement without thereafter affording CBS Records a reasonable opportunity to cure the same; provided however, in the event the purported breach concerns the payment of monies to you, such reasonable opportunity shall not be in excess of the later of thirty (30) days after the expiration of the thirty (30) day cure period afforded to us or thirty (30) days after the date of your notice to CBS Records. We understand and agree that if CBS Records proceeds to cure such breach, then and in such event CBS Records shall be entitled to require us to assign its rights under the Agreement to it and upon such assignment CBS Records shall assume our obligations arising pursuant to the Agreement from and after the effective date of such assignment. Notice to CBS Records is to be sent to the following address:

            CBS Records, A Division of CBS Inc.
            51 West 52nd Street
            New York, New York 10019

            Attn: Vice President, Business Affairs
                  and Administration

Messrs. Walter Williams,
Eddie Levert & William Powell                    As of August 26, 1975

Except as herein expressly modified and/or stated to the contrary
the Agreement shall remain in full force and effect.

Very truly yours,

GAMBLE-HUFF PRODUCTIONS, INC.

By _____
    Exec. V.P. Gen. Mgr.

ACCEPTED AND AGREED TO:

_____
WALTER WILLIAMS

_____
EDDIE LEVERT

_____
WILLIAM POWELL

- 2 -

GAMBLE-HUFF PRODUCTIONS, INC.
309 South Broad Street
Philadelphia, Pennsylvania 19107

August 25, 1975

Messrs. Walter Williams,
Eddie Levert & William Powell
c/o Walter Williams
3569 Winchell Road
Shaker Heights, Ohio 44120

Dear Sirs:

The following, when signed by you and us, will
constitute a modification of the agreement between us
dated as of January 15, 1972, including the Supplemental
Agreement appended thereto (hereinafter collectively re-
ferred to as the "Agreement"), pursuant to which you per-
form as exclusive recording artists for us:

1.    In lieu of the term set forth in the Agree-
ment, the term of the Agreement shall be for a three (3)
year period commencing October 15, 1975 and terminating
October 14, 1978.  During said term, you agree to render
your services at recording sessions at studios selected
by us and at times and places selected by us after consul-
tation with you so that said recording dates, places and
times will be consistent with your other personal and
professional obligations.  Notwithstanding the foregoing,
in the event you shall record outside of Philadelphia,
Pennsylvania, and as a result of such recording outside
of Philadelphia your costs of transportation exceed your
normal costs of transportation from Cleveland, Ohio to
Philadelphia, then, in such event, we shall bear such
excess costs as our sole obligation.  Furthermore, and
notwithstanding the foregoing, we agree that the first
Five Thousand Dollars ($5,000.00) of transportation and
living costs incurred in connection with the rendition of
your recording services hereunder with respect to any one
album shall either be paid directly by us, promptly when
due, or, in the event you shall have theretofore paid for
any such expenses, promptly reimbursed by us to you, and
such payment by us shall constitute an additional Accompani-
ment Cost (as such phrase is defined in the Agreement) in

Messrs. Walter Williams,
Eddie Levert & William Powell
August 25, 1975
Page 2

*E.L.*
*E.L. G.N.*

*W. P.*

connection with the rendition of your recording ser-
vices. Any such costs in excess of Five Thousand
Dollars ($5,000.00), incurred in connection with any
one album hereunder, shall be borne solely by you.
In lieu of the recording commitment set forth in the
Agreement, you agree to perform for the recording of
satisfactory master recordings to constitute five (5)
33-1/3 rpm phonograph albums in addition to the album
tentatively entitled "Family Reunion" which you have
recorded during July and August, 1975. Notwithstand-
ing anything to the contrary contained herein, we agree
that should you complete your recording commitment to us,
as defined above, prior to October 14, 1978, then, and
in said event, the term of the Agreement and of this
amendment shall expire on the date upon which you have
finished your performance for said fifth album.

2. Notwithstanding anything to the contrary
contained in the Agreement, we agree that the producers
for each of the albums to be recorded by you pursuant to
the provisions hereof shall be Kenny Gamble and Leon Huff;
provided, however, in the event that either Kenny Gamble
or Leon Huff, or both of them, shall be unavailable for
any reason to produce such albums, then it is agreed
that a substitute producer or producers shall be desig-
nated, which producer or producers shall be subject to
the mutual approval of both you and the undersigned,
which approval shall not unreasonably be withheld. All
royalties, advances or other sums required to be paid to
or for the account of any such producers shall be borne
solely by us.

3. We agree to pay you a royalty equal to
Fourteen per cent (14%) of One Hundred per cent (100%)
of the applicable wholesale price on all records and/or
tapes sold by us or our distributor (our current distri-
butor is CBS Records, Inc.), subsequent to July 1, 1975
regardless of when the master tapes from which said records
and/or tapes are derived were recorded. Said royalty of
Fourteen per cent (14%) of One Hundred per cent (100%)
shall be deemed inserted in Paragraph 7(a) of the Agree-
ment in lieu of the royalty provided for therein. Further-
more, Paragraph 8(d) of the Agreement shall be deemed
amended to provide for the payment to you of a full royalty

Messrs. Walter Williams,
Eddie Levert & William Powell
August 25, 1975
Page 3

(Fourteen per cent [14%]) in respect of phonograph records
sold in the form of pre-recorded tapes, of any configuration
whatsoever, which royalty shall be based upon One Hundred
per cent (100%) of the applicable wholesale price of such
phonograph records in the form of pre-recorded tapes.

4. a) We agree to pay to you the sum of
One Million Dollars ($1,000,000.00) in the following
manner: We shall make a payment to you in the amount
of One Hundred Sixty-Six Thousand, Six Hundred Sixty-Six
Dollars and Sixty-Six Cents ($166,666.66), within Four-
teen (14) days after completion of each of the albums re-
ferred to in Paragraph 1 herein (including the album tenta-
tively entitled "Family Reunion").

b) Notwithstanding the foregoing, we shall
pay to you the sum of Four Hundred Thousand Dollars
($400,000.00) concurrently with the execution of this
agreement.

c) We shall recoup said Four Hundred Thousand
Dollar ($400,000.00) payment from all royalties payable to
you based on sales subsequent to July 1, 1975 and all pay-
ments which would otherwise be payable to you pursuant to
Paragraph 4 (a) hereof. After we have recouped said Four
Hundred Thousand Dollars ($400,000.00), we shall pay you
pursuant to Paragraph 4 (a) hereof.

d) It is understood that we shall continue
to advance all "Accompaniment Costs" as defined in Para-
graph 6 of the Agreement and as amended herein and shall
not recoup any such Accompaniment Costs from any sums pay-
able to you pursuant to Paragraph 4 hereof; provided, how-
ever, that in the event such Accompaniment Costs shall ex-
ceed the sum of Three Hundred Sixty Thousand Dollars
($360,000.00), in the aggregate, in connection with the
recording of the phonograph record albums described in
Paragraph 1 hereof (including the phonograph record album
tentatively entitled "Family Reunion"), then only such
Accompaniment Costs in excess of Three Hundred Sixty
Thousand Dollars ($360,000.00) shall be chargeable against
the sums payable by us to you pursuant to Paragraph 4 a)
hereof.

Messrs. Walter Williams,
Eddie Levert & William Powell
August 25, 1975
Page 4

E.L.
G.W.
W.P.

e) (1) Accompaniment Costs incurred in connection with the recording of the albums described in Paragraph 1 hereof (including the album tentatively entitled "Family Reunion") shall be recoupable by us, to the extent not theretofore recouped, and (ii) the sums payable to you pursuant to Paragraph 4 a) hereof, shall be recoupable by us, only from royalties payable to you from sales of records and/or tapes subsequent to June 30, 1975, regardless of when the master tapes from which such records and/or tapes are derived, were recorded.

5. If any of you leaves or is unable to perform as a member of "The O'Jays" for the purpose of recording, we shall have the absolute right to terminate this agreement with no further liability other than for royalties on sales of phonograph records containing your performances. We shall notify you no later than Twenty-six (26) days after we have received notice of such member leaving or being unable to perform of our decision to terminate this agreement. Our failure to notify you within said period shall constitute a waiver of such right of termination. In the event that we waive such right in any specific instance(s) and any new member(s) joins the group, the foregoing shall apply in the event any remaining or new member(s) thereafter leaves the group, or is unable to perform as a member of the group in each instance.

6. Notwithstanding anything to the contrary contained in the Agreement, all references to Prime Enterprises, Inc. shall be deemed to be deleted, so that, for example, all royalties payable to you, if any, shall be payable only to you, at the address first hereinabove written.

7. The provisions of Paragraph 10 (c) of the Agreement shall be deemed to be deleted insofar as such provisions relate to merchandising rights, so as to be of no force or effect whatsoever; it being the intention of the parties hereto that we shall not have any merchandising rights whatsoever with respect to you, and The O'Jays.

8. We agree that all records recorded by you pursuant to the provisions hereof shall be released on

Messrs. Walter Williams,
Eddie Levert & William Powell
August 25, 1975
Page 5

the Philadelphia-International Records label or on
such other label which we may use in connection with
the majority of our other top selling artists.

9. Notwithstanding anything to the contrary
contained in Paragraph 13 of the Agreement, we shall
have the right to assign the Agreement (including this
amendment) and any of our rights thereunder or hereunder
only to a subsidiary or division of Gamble-Huff Produc-
tions, Inc. or to an entity which shall acquire all or
substantially all of our stock and assets; provided,
however, that any such assignment shall not relieve us
of any of our obligations hereunder, including, with-
out limitation, our obligation to release records embody-
ing your performances on the record label hereinabove
described.

10. The first sentence of Paragraph 10 (f) of
the Agreement shall be revised so that its provisions shall
be deemed to be applicable to us, as well as to you, so
that in the circumstances described therein, we shall not
unreasonably withhold our agreement, approval or consent.

11. Except as specifically modified herein
either directly or by implication, the Agreement is in
all events ratified and reaffirmed.

Very truly yours,

GAMBLE-HUFF PRODUCTIONS, INC.

By _____
Executive Vice Pres—Gen Mg

ACCEPTED AND AGREED TO:

_____
Walter Williams

_____
Eddie Levert

_____
William Powell

EXHIBIT "G"

March 15, 1977

ASSORTED MUSIC INC  O/B/S  Phila International Records
~~Gamble-Huff Productions~~
309 South Broad Street
Philadelphia, Pa. 19107

Gentlemen:

Please be advised that the undersigned, performing as "THE O'JAYS"
, has entered into an Exclusive Recording
Agreement with you dated as of March 15, 1977 . With reference
to the same, the undersigned hereby requests the following.

1.)   Any and all notices to be sent to the undersigned
      pursuant to paragraph 17(j) of said Agreement,
      shall be sent to the parties at the addresses listed
      below.

      12608 Miles                    OR Eddie Levert
      c/o Ojays Inc.                 3304 Werington
      Cleveland Ohio 44105           Cleveland Ohio 44120

2.)   Any and all payments, advances, royalties, etc. to be made
      to the undersigned, pursuant to paragraph 25 of said
      Agreement, shall be paid as follows.

NAME & ADDRESS                        PERCENTAGE OF SAID PAYMENT
---------------                       ---------------------------

Thank you for your kind attention.

                              Very truly yours,

                              _Eddie Levert_
_____       EDDIE LEVERT

                              _Walter Williams_
_____       WALTER WILLIAMS

PIR 941

Dated as of
March 15, 1977

Eddie Levert                    Walter Williams

Dear Messrs. Levert and Williams:

The following, when signed by you and us, will constitute the
agreement between you and us, pursuant to which you will per-
form exclusively for us as a recording artist, upon the terms
and conditions herein set forth:

1. This agreement shall commence as of the date hereof
and shall continue in force for a term which shall con-
sist of an initial period of forty-five (45) months from such date,
or until you have completed the recording of five (5) studio long playing albums,
whichever date last occurs.

2. During the term of this agreement, you will render your
services at recording sessions at studios selected by us, at
times and places to be designated by us, for the purpose of mak-
ing phonograph records. The musical compositions to be recorded
shall be designated by us, and each master recording made here-
under shall be subject to our approval as satisfactory for the
manufacture and sale of records. During the initial period of
the term hereof, you will perform for the recording of satis-
factory master recordings which shall consist of a sufficient
number of     45 r.p.m. sides, or their equivalent, to comprise a
minimum of five (5) studio long playing albums, and we will record your per-
formances. Additional master recordings shall be performed by you and recorded
by us at our election.

3. During the term of this agreement you will not perform
for the purpose of making phonograph records or master record-
ings for any person other than us, and during a period of five
(5) years after the expiration of the term of this agreement,
for any reason whatsoever, you will not perform any musical
composition which shall have been recorded hereunder for any
person other than us for the purpose of making phonograph records
or master recordings. It is agreed between you and us that your
services to be rendered hereunder are of a special, unique, un-
usual, extraordinary and intellectual character, involving skill
of the highest order, which gives them a peculiar value, the loss
of which cannot be reasonably or adequately compensated by dam-
ages in an action at law, and that your breach of any of the pro-
visions contained in this agreement shall cause us irreparable

damage and injury. You hereby expressly agree that we will be entitled to injunctive relief and other equitable relief to prevent or cure any breach or threatened breach of this agreement by you.

4. All master recordings recorded hereunder and all metalics and phonograph records manufactured therefrom, together with the performances embodied thereon, shall be entirely our property, free from any claims whatsoever by you or any person deriving any rights or interests from you. Without limiting the generality of the foregoing, we and/or our subsidiaries, affiliates and licensees shall have the unlimited right, from time to time, to manufacture by any method now or hereafter known phonograph records and other reproductions on any mediums or devices now or hereafter known, of the master recordings made hereunder, and to sell, transfer or otherwise deal in the same throughout the world under any trademark, trade name and label, or to refrain from such manufacture, sale and dealing. The first release in the United States shall be on the Philadelphia International Records label or on such other label used in connection with the majority of other top selling artists associated with us.

5. At our election, all compositions recorded pursuant to this or any other agreement between you and us which are written or composed by you or owned or controlled by you or any party which is allied or affiliated with you or in which you have direct or indirect interest, shall be licensed to us at the then current statutory rate for each 45 r.p.m. record side, or its equivalent, on the basis of Ninety (90%) Per Cent of net sales of records, except that (i) with respect to records sold and/or distributed as "bonus" or "free" records through any "Club Operation" (as defined in sub-paragraph 8(b) of this agreement), the royalty rate shall be one-half (½) of the rate set forth above, payable on the basis of Ninety (90%) Per Cent of net sales of records; and (ii) no copyright royalties shall be payable with respect to records described in sub-paragraph 8(f) hereof. Arranged versions of musical compositions in the public domain, when furnished by you or any party described above for recordings hereunder, shall be free of copyright royalties. Any assignment made of the ownership or copyright in any such composition or in any such arranged version of a musical composition in the public domain shall be made subject to the provisions hereof. In the event we are required to pay mechanical copyright royalties in excess of those provided in this Paragraph 5, we shall have the right to charge such excess against all royalties or other sums payable to you hereunder. You hereby assign any and all publishing interests in said compositions to our nominee.

6. (a) For your services rendered hereunder, and for the rights granted herein to us, we will make a non-returnable payment to you, within fourteen (14) days after the services are rendered at each recording session, at the rate of union scale; and each such payment shall constitute an advance and shall be charged against your royalties under this and/or any other agreement between you and us; if and when earned. Without limiting the generality of the foregoing, included among payments which shall hereunder constitute

advances chargeable against royalties shall be all amounts which ... ... ... ... bargaining agreement between us and any union representing you for performances hereunder.

(b) We shall specify your accompaniment (instrumental and vocal), arrangements and copying and studio charges and/or rentals in respect of master recordings made hereunder, and we shall pay the costs of such accompaniment as well as the costs of such arrangements and copying and studio charges and/or rentals which are specifically undertaken in respect of such master recordings (such costs are hereinafter collectively referred to as "Accompaniment Costs"); and all such Accompaniment Costs so paid by us shall constitute advances and shall be charged against your royalties earned. Without limiting the generality of the foregoing, included among Accompaniment Costs, which shall hereunder constitute advances chargeable against royalties, shall be all amounts which are paid by us pursuant to the requirements of any collective bargaining agreements between us and any union representing other persons who render services hereunder or in connection with any accompaniment (instrumental and vocal), arrangements and copying and producer's fees and travel expenses and studio charges and/or rentals or any other expenses whatsoever relating thereto.
(i) See paragraph 30.

7. (a) We will pay you a basic royalty of (i) Eighteen and four-Tenths (18.4%) Per Cent for long playing albums and fifteen (15%) Per Cent for 45 r.p.m. records of the applicable wholesale price (less all taxes) in respect of One Hundred (100%) Per Cent of all phonograph records consisting entirely on both sides thereof of a composition or compositions performed by you and recorded hereunder, manufactured and sold by us or by any subsidiary, affiliate or licensee to whom we have supplied a copy or duplicate of a master or a matrix of or embodying such composition or compositions; and (ii) one-half (½) of such percentage of the applicable wholesale price (less all taxes) in respect of One Hundred (100%) Per Cent of all phonograph records consisting entirely of such composition or compositions on only one side thereof, so manufactured and sold hereunder, we shall have the right to deduct returns and credits of any nature, including, without limitation, those on account of One Hundred (100%) Per Cent return privileges, defective merchandise, exchange privilege, promotional credits, error in billing, usable overstock and error in shipment.

(b) Royalties for records sold for distribution outside of the United States of America shall be computed in the national currency, at our election, of the country of manufacture, the country of sale of the United States of America, and as to sales made for distribution outside of the United States of America, shall be paid at the same rate of exchange as we are paid; provided, however, that royalties on records sold for distribution outside of the United States of America shall not be due and payable until payment therefor has been received by us in the United States of America, and provided further, that if we do not receive payment in United States dollars currently and -

elect to accept payment in a foreign currency, we may deposit
your account (and at your expense) in such currency in a
depository selected by us, all payments so received as royal-
ties applicable to this agreement, and shall notify you there-
of promptly.   Such deposit, as above stated, shall fulfill our
obligation hereunder as to record sales to which such royalty
payments are applicable.

(c) With respect to any master recording embodying
your performance hereunder, together with the performance of
another artist or artists to whom we are obligated to pay royal-
ties in respect of phonograph records embodying the joint per-
formances contained on such master recording:

(i) the royalty rate to be used in determining the
royalties payable to you in respect of such master recording
shall be computed by multiplying the royalty rate otherwise
applicable thereto by a fraction, the numerator of which shall
be one (1) and the denominator shall be the total number of royalty artists
whose performances are embodied on such master recording; and

(ii) in determining the portion of the Accompaniment
Costs applicable to such master recording which shall be charged
against your royalties if and when earned, such portion shall be
computed by multiplying the aggregate amount of such Accompani-
ment Costs by the same fraction used in determining the royal-
ties payable to you in respect of such master recording.

(d) With respect to a side of a long-playing (33-1/3
r.p.m.) or extended-play microgroove record, which embodies on
such side performances contained on another master recording(s)
in addition to the performances contained on a master record-
ing(s) recorded hereunder, the royalty payable to you in re-
spect of such record side shall be computed by basing the rate
provided in sub-paragraph 7(a)(ii) (or other applicable rate)
upon that proportion of the applicable wholesale price (less all
taxes) of such record that the number of 45 r.p.m. sides required
to embody your performances recorded hereunder on such record
side bears to the total number of 45 r.p.m. sides required to em-
body the total number of performances on such record side.

(e) With respect to all phonograph records sold hereunder,
royalties on phonograph records included in albums, jackets, cart-
ridges, cassettes, boxes or any other type of package or container
(herein collectively referred to as "container(s)") shall be based
solely upon the applicable wholesale price of such phonograph re-
cords in containers less all taxes and also less a container charge
not to exceed Ten (10%) Per Cent of the applicable price of disc.
phonograph records and Twenty-five (25%) Per Cent with respect to
all other forms of records, as such wholesale price is defined in
sub-paragraph (e)(i) or (e)(ii), as the case may be, of Paragraph
17 hereof.

9. Notwithstanding anything to the contrary contained in this or any other agreement between you and us, the following shall apply with respect to phonograph records manufactured pursuant to this or any other such agreement and sold and/or distributed in the manner set forth hereinbelow.

(a) In respect of phonograph records sold for distribution outside of the United States of America, the royalty rate payable to you therefor shall be equal to one-half (½) of the applicable royalty rate which would have been payable to you therefor if such records had been sold for distribution in the United States of America.

(b) In respect of phonograph records sold through any direct mail order operation or through any direct sales-to-consumer operation carried on by us, our subsidiaries, affiliates or licensees, including, without limitation, any Record or Tape Club (herein collectively referred to as "Club Operation"), the royalty rate shall be one-quarter (¼) of the otherwise applicable royalty rate. Notwithstanding the preceding sentence, if such phonograph records are sold through any such Club Operation at a price (excluding postage and handling charges) of One ($1.00) Dollar or less, the royalty rate payable to you in respect of such phonograph records shall be one-half (½) of the royalty rate which would have been payable to you in respect of such phonograph records if they had been sold through such Club Operation at a price of more than One ($1.00) Dollar and, notwithstanding anything to the contrary contained in this agreement, such royalty rate shall be computed on the basis of the actual sales price charged by such Club Operation for such phonograph records (excluding postage and handling charges). Notwithstanding anything contained in the foregoing two sentences or elsewhere in this agreement, no royalty shall be payable to you with respect to (i) phonograph records which are received by members of any Club Operation, either in an introductory offer in connection with such Club Operation or upon recommending that another join such Club Operation and/or as a result of the purchase of a required number of records, including, without limitation, records distributed as "bonus" and/or "free" records, or (ii) phonograph records for which such Club Operation is not paid.

(c) In respect of phonograph records sold to our clients for promotional, sales incentives or educational purposes or phonograph records sold to educational institutions or libraries, the royalty rate payable to you therefor shall be one-half (½) the royalty rate otherwise payable and shall be computed on the basis of the actual sales price therefor (less all taxes and container charges) to any of the foregoing.

(d) In respect of phonograph records sold in the form of pre-recorded tape, the royalty rate payable to you therefor shall be the same as the applicable royalty rate otherwise payable if such record(s) were sold in disc form.

(e) In respect of phonograph records sold on a "low-price" or "budget" label, the royalty rate shall be one-half (½) the applicable rate otherwise payable.

(f) No royalty shall be payable to you in respect of phonograph records sold as "cut-outs" after the listing of such records has been deleted from our catalog or in respect of phonograph records distributed as "free" or "no-charge" records or records sold and/or distributed to radio stations or for use on transportation facilities to promote or stimulate the sale of phonograph records embodying your performances.

(g) Without limiting any of the other provisions of this agreement, and in addition to all of our other rights hereunder, we shall have the right to license your recordings to other parties (a) for phonograph record use on a flat fee basis (as opposed to the royalty basis referred to in Paragraphs 7 and 8 above) and (b) for all other types of use (visual and non-visual) on a flat fee or royalty basis. We shall credit your royalty account with a percentage of the amount received by us under each such license, which percentage shall be the royalty rate set forth in sub-paragraph 7(a)(i) above, subject, however, to all the above-stated terms and conditions.

(h) All of the provisions of Paragraph 7 and this Paragraph 8 shall apply on a cumulative basis wherever applicable.

9. In respect of the royalties provided for herein:

(a) We will compute royalties payable to you hereunder within ninety(90) days after June 30 and after December 31 of each year during which records made hereunder are sold for the preceding six (6) month period, and will render accountings for and pay such royalties, less any unrecouped advances under this and/or any other agreement between you and us, within such ninety(90) days, except as provided in sub-paragraph 7(b) hereof, and except with respect to sales of records upon which royalties are payable to us by a distributor thereof. We shall be responsible for payment of your royalties on such sales only after receipt by us from such distributor of the royalties applicable to such sales.

(b) All royalty statements and all other accounts rendered by us to you hereunder shall be binding upon you and not subject to any objection by you for any reason whatsoever unless specific objection in writing, stating the basis thereof, is given to us within six (6) months from the date rendered. Notwithstanding anything to the contrary contained herein, we shall be under no obligation to account to you in respect of, and/or pay to you, sums of Fifty ($50.00) Dollars or less, unless we receive a written demand from you for such an accounting and payment.

10. (a) you warrant and represent that you own all rights in and to the name "THE O'JAYS" (hereinafter referred to as the "Name") and that you have the sole and exclusive right to use and to allow others to use the Name in connection with the manufacture, advertising and sale of phonograph records. You hereby grant to us, and further warrant and represent, that we shall have the right to use and to allow others to use the Name for advertising and purposes of trade and otherwise without restriction in connection with the phonograph records made pursuant to this agreement and in advertisements for our company, its artist and products and exclusively in connection with the merchandising rights to the same extent and on the same terms and conditions as set forth herein with respect to your individual names. It is understood and agreed that (i) during the term of this agreement you will not authorize or knowingly permit any performance by any person or persons who shall in any way be indentified with the Name (or any name substantially similar thereto) for the purpose of making phonograph records for any person other than us, and (ii) during a period of five (5) years after the expiration of the term of this agreement, for any reason whatsoever, you will not authorize or knowingly permit the performance by any person or persons who shall in any way be identified with the Name (or any name substantially similar thereto) of any compositions recorded hereunder for any person other than us for the purpose of making phonograph records. It is further understood and agreed that you will not at any time manufacture, distribute or sell or authorize or knowingly permit the manufacture, distribution or sale by any person other than us of phonograph records embodying (i) the performances by any person or persons rendered during the term of this agreement, or (ii) the performance by any person or persons of a composition recorded hereunder rendered within five (5) years after the expiration of the term of this agreement, which phonograph records and/or performances shall in any way be identified with the Name or any name substantially similar thereto. You acknowledge that any use of the Name (or any name substantially similar thereto) contrary to the provisions hereof would cause us irreparable injury, and you agree to use your best efforts in assisting us to prevent any such use.

(b) In the event that during the term of this agreement any artist shall leave the group hereunder identified with the name and/or shall cease to perform as a member of such group, you shall promptly give us notice in writing to such effect and in the event we shall deem it advisable, such leaving member shall be replaced by a new member who shall be mutually acceptable; and the name of such new member shall thereafter be deemed substituted in this agreement in the place of such leaving member, and such new member, by performing hereunder, shall automatically be bound by all terms and conditions of this agreement. Upon our request therefor, the remaining members of the group will duly cause any such new member to execute and deliver to us such document as we, in our judgment, may deem necessary or expedient to carry-out or effectuate the purpose or intent of the foregoing sentence. Such leaving member shall thereafter be relieved from further performances hereunder with the group, but shall continue to be bound individually by the applicable provisions of this agreement including, without limitation, the provisions set forth in sub-paragraphs 10(c) and 3 hereof. (i) See paragraph 29.

(c) You warrant and represent that, in the event any one or more of the artists shall so leave the group as provided in sub-paragraph 10(d) hereof, we shall have, and you and each of you does hereby grant to us, an irrevocable option on your individual and exclusive services for the purpose of making phonograph records. Such option, with respect to any such leaving member, may be exercised by us by giving such leaving member notice in writing within ninety (90) days after our receipt of the notice provided for in said sub-paragraph 10(d); and, in the event of our such exercise of option, such leaving member shall execute our then current standard form of term recording contract containing the following provisions:

(i) a term consisting of not less than the remaining balance of the term of this agreement as it may be extended by our exercise of the options granted to us herein;

(ii) a minimum of four (4) 45 r.p.m. record sides or their equivalent for which satisfactory master recordings will be performed and recorded during each year of such term, it being understood and agreed that if the remaining balance of the term of this agreement shall be less than six (6) months; then the minimum number of such 45 r.p.m. record sides for which master recordings will be performed and recorded during such remaining balance of the term shall be one-half (½) of the foregoing number;

(iii) a royalty in respect of phonograph records embodying performances recorded during such term at one-half (½) of the rates set forth in Paragraphs 7 and 8 of this agreement; and

(iv) a payment for services rendered at each recording session at the rate of union scale, which payment shall constitute advances chargeable against such royalties.

In the event that during the term of this agreement the group shall completely disband, you shall promptly give us notice in writing to such effect, and, in such event, the provisions of this sub-paragraph 10(c) shall be applicable with respect to each member of the group.

(d) Your duties, liabilities, obligations, warranties, representations, authorizations and agreements contained in this agreement joint and several and all references herein to "you" and "your" in connection therewith shall include all of you inclusively and each of you individually, unless otherwise specified.

(e) The provisions of Paragraph 10(b) through 10(d) will only apply if there is more than one (1) recording artist.

11. (a) We shall have the world-wide right in perpetuity to use and to allow others to use your name (both legal and professional) and likeness and biographical material concerning you for advertising and purposes of trade, and otherwise without restriction, in connection with the phonograph records made pursuant to this agreement and in advertisements for our company, its artists and products. We shall not use or authorize any direct endorsement by you of any record or performance without your prior written consent. We shall have the further right to refer to you by your name as our exclusive Artist and you shall, in your activities in the entertainment field, use your best efforts to be billed and advertised as our exclusive Artist. During the term of this agreement, you shall not endorse or authorize your name or likeness to be used in connection with the advertising or sale of products in the same category as those which are currently manufactured and sold by or for us.

(b) Without limiting the provisions of sub-paragraph 11(a) hereof, you hereby grant to us, during the term of this agreement, the exclusive right, throughout the world, to authorize the use of your name and/or likeness and/or biographical material concerning you, whether alone or in conjunction with other elements, in connection with the sale, lease, license or other disposition (herein collectively referred to as "sale(s)") or merchandising rights and to enter into agreements covering such sales. It is expressly understood and agreed that any contract entered into by us for such a sale during the term of this agreement shall continue in full force and effect in accordance with the provisions thereof, but after the termination of the term of this agreement, we shall have no right to enter into a new contract to make any new sale authorizing the use of your name and/or likeness after the termination of the term of this agreement. For the rights granted by this sub-paragraph we will pay you, in United States dollars, Fifty (50%) Per Cent of the net monies earned and received by us in the United States of America from such sales of merchandising rights authorizing the use of your name and/or likeness and/or biographical material concerning you pursuant to this agreement.

12. (a) You will not, at any time, manufacture, distribute or sell or authorize or knowingly permit the manufacture, distribution or sale by any person other than us of phonograph records embodying:

(i) any performance rendered by you during the term of this agreement; or

(ii) any performance rendered by you within five (5) years after the expiration of the term of this agreement of a composition which shall have been recorded pursuant to this agreement.

(b) You will not record or authorize or knowingly permit to be recorded for any purpose any such performances without in each case taking reasonable measures to prevent the manufacture, distribution and sale at any time by any person other than us of phonograph records embodying such performances. Specifically, without limiting the generality of the foregoing, you agree:

(i) if, during the term of this agreement you perform for the purpose of making transcriptions for radio or television or soundtracks for motion picture films; or

(ii) if, within five (5) years after the expiration of the term of this agreement you perform for any such purpose any composition which shall have been recorded pursuant to this agreement;

you will do so only pursuant to a written contract containing an express provision that neither such performance nor any recording thereof will be used, directly or indirectly, for the purpose of making phonograph records. You will promptly furnish to us, at our office, a copy of the pertinent provisions of each such contract and will cooperate fully with us in any controversy which may arise or litigation which may be brought relating to our rights under this paragraph.

13. You warrant and represent that you are under no disability, restriction or prohibition in respect of (a) your right to execute this agreement and perform its terms and conditions, and more particularly, (b) your right to perform for the recording of any and all compositions hereunder, except to the extent, if any, set forth in Schedule I attached hereto and made a part hereof. You agree to and do hereby indemnify, save and hold us harmless from loss or damage (including reasonable attorneys' fees) arising out of or connected with any claim by a third party which is inconsistent with any of the warranties or representations made by you in this agreement. You will reimburse us on demand for any payment made by us at any time after the date hereof in respect of any liability or claim to which the foregoing indemnity relates, and we may retain any sums whatsoever to be paid to you hereunder or under any other agreement between you and us or any of our affiliates for said reimbursement.

(a) See paragraph 33.
(b) See paragraph 34.

14. We may, at our election, assign this agreement or any of our rights hereunder to any subsidiary, division or affiliate of ours, or to any entity which shall acquire all or substantially all of our stock and assets; provided, however, that we shall remain liable for all obligations hereunder, including without limitation the obligation to release records hereunder on the record label mentioned in paragraph 4.

PIR 951

15. (a) You warrant and represent that you are now a member, in good standing of the AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS and/or the AMERICAN FEDERATION OF MUSICIANS and/or any other applicable labor union with which we may at any time have agreements lawfully requiring such union membership, or that you will become a member within thirty (30) days after the signing of this agreement, and that you will remain so during the term of this agreement.

(b) The provisions of the AFTRA National Code of Fair Practice for Phonograph Recordings, if applicable, are made a part of this agreement with the same force and effect as if fully set forth herein.

16. If, during the term of this agreement we fail, except for reasons set forth in Paragraph 27 hereof, to record master recordings constituting the minimum number of record sides provided for herein and, if within thirty (30) days after the expiration of the term hereof you shall notify us by registered mail of your request that we record such of your performances as well as fulfill our minimum obligation hereunder, then we shall, at our option, within sixty (60) days after our receipt of such request, either record such performances or pay you at the rate of union scale in full settlement of our obligation in connection therewith. In the event that you do not so notify us within such thirty (30) day period, then we shall be under no obligation to you for failure to record master recordings constituting such minimum number of record sides. Notwithstanding the above this paragraph shall not limit our obligation to pay you advances pursuant to paragraph 31 hereof.

17. For purposes of this agreement:

(a) "Master recording" means any original recording, whether on magnetic tape or wire, a laqueur or wax disc, or on any other substance or material, whether now known or unknown, which is used in the manufacture of phonograph records;

(b) "Matrix" means any dye or mold or device which is now or hereafter used, directly or indirectly, in the manufacture of phonograph records and which is made from master recordings;

PIR 952

(c) "Person" is ", ..." to ..., ..., individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing;

(d) "Records", "phonograph records" and "recordings" mean and include all forms of recording and reproductions, now known or which may hereafter become known, manufactured or sold primarily for home use and/or jukebox use and/or use on transportation facilities, including, without limiting the generality of the foregoing, magnetic recording tape, film and any other medium or device for the reproduction of artistic performances manufactured or sold primarily for home use and/or jukebox use and/or use on transportation facilities, whether embodying:

    (i) sound alone; or

    (ii) sound synchronized with visual images, e.g., "sight and sound" devices; *It is here in understood that the royalty rate for these devices shall be negotiated at a future date.*

(e) "Wholesale price" means:

    (i) With respect to records sold hereunder for distribution in the United States of America, the average net price received from distributors for our phonograph records during the six-month period immediately preceding the applicable accounting period for the computation of the royalties to be made pursuant to subparagraph 9(a) hereof, it being understood that a separate calculation of the average wholesale price shall be made for each price category of phonograph records manufactured and sold by us; and

    (ii) With respect to records sold hereunder for distribution outside the United States of America, one-half (½) of the suggested retail list price or applicable list price (less container charges and local taxes, if any), as the case may be, of such records in, at our election, the country of manufacture, the United States of America or the country of sale;

(f) "Records sold" shall mean records shipped, paid for and not returned or exchanged. In the event records hereunder are shipped subject to a discount or merchandising plan, the number of records deemed to have been sold shall be determined by reducing the number of records shipped by the percentage of discount granted. In the event a discount is granted in the form of "free" or "bonus" merchandise, such "free" or "bonus" merchandise shall not be deemed included in the number of records sold. "Records sold" shall not include records given away or distributed for Fifty (50%) Per Cent or less of the regular wholesale price to distributors or others for promotion or exploitation purposes in connection with the inducement of sale of other records hereunder.

(g) "Merchandising rights" shall mean and include all rights with respect to printed material, endorsements and merchandising of commercial tie-ups, in connection with the manufacture, advertising

PIR 953

and sale of physical property, including with at limitation, toys, novelties, books, paper cut-outs, activity books, etc.; and

(h) As used in sub-paragraph 11(b) hereof, "net monies earned and received" shall mean the total amount received by us pursuant to sales (as that term is defined in sub-paragraph 11(b) hereof) of merchandising rights hereunder, after the deduction of all direct costs, expenses and commissions attributable to such sales, and after the deduction of any amounts which we may be required to pay, as expenses, commissions or otherwise, to third persons in connection with such sales, all of which are to be computed in accordance with our standard account practices and procedures.

(i) As used herein, "low-price" or "budget" labels shall mean any label used by us, our subsidiaries, affiliates, distributors or licensees, signifying that the records bearing such label carry a suggested retail list price substantially lower than the suggested retail list price for records bearing the standard labels used by us, our said subsidiaries, affiliates, distributors and/or licensees.

(j) As used herein, "notices" shall be forwarded in accordance with the following:

All notices which we are required or may desire to give you under or in connection with this agreement shall be sufficient if given by addressing same to you at the address listed on page 1 hereof unless another address is listed at the end of this paragraph or such other address as may be designated by you in writing, or at the address last known to us, and when same is deposited so addressed, postage prepaid, in the United States Mail, and/or when we shall have delivered same addressed to you at the aforesaid address, and/or when same shall have been delivered to a telegraph company duly prepaid, we shall be deemed to have delivered such notice. Notices to be sent by you to us will be sent to us at our address on Page 1 hereof, and will be subject to the same terms and conditions as hereinbefore stated.

18. No failure by us to perform hereunder, and no act or failure to act shall be deemed a material breach of this contract unless you shall first deliver to us, and to the record company principally distributing your recordings in the United States, a written notice specifying the alleged failure to perform or the alleged failure to act constituting such material breach, and we shall have failed to cure any such material breach within thirty (30) days after receipt by us of such notice from you. In the event we do not cure any such breach within the said thirty (30)-day interval, then it is specifically understood and agreed that this contract may be assigned to the said record company distributing your recordings in the United States, and such record company shall have an additional thirty (30)-day period to cure the said material breach in such event.

19. Any option to extend the term of this agreement, as hereinafter in this agreement granted to us, may be exercised by us by giving you notice in writing at least ten (10) days prior to the

ouT

expiration of such term. Such notice to you may be given by delivery to you by mail, to you at your address last known to us. Such notice by mail shall be deemed to have been given on the date on which it is mailed.

20. At the end of the term hereof you hereby grant to us the right to offer to you a recording agreement based on the same terms and conditions as any valid recording agreement offered to you in good faith by any then existing international recording company. You agree to notify us in writing of any such offer, and if within sixty (60) days from the date of such notice we present to you a similar offer, then said offer by us will be deemed to be automatically accepted by you. If we do not make said offer to you, then you will be allowed to enter into said agreement with said other company provided that:

(a) The terms and conditions thereof have not been changed from those contained in your notice to us;

(b) Said contract was entered into within sixty (60) days after our failure to make said offer to you; and

(c) You immediately forward to us a copy of said fully signed Agreement.

Otherwise, our rights as contained herein shall continue.

21. Intentionally deleted.

22. Intentionally deleted.

23. Intentionally deleted.

24. We shall have the sole and exclusive control of the distribution of phonograph records produced hereunder and shall have the right to distribute, market and exploit the same directly or through any subsidiary, affiliate or licensee of ours or through any franchise holder, distributor, licensee or other person throughout the world. It is specifically understood and agreed that we have absolute title to all master recordings produced hereunder and all records produced therefrom and that the expiration, suspension or termination of this agreement for any reason shall not affect our ownership thereof, our right to distribute records as herein provided,

our right to use your name and likeness as herein provided, or the
other rights herein granted ' ... will shall survive in any event.

25. It is hereby agreed that all royalties due and payable pursu-
ant to this agreement shall be paid to you unless different
provisions are provided for at the end of this paragraph
and that payment thereto of such royalties shall discharge our entire
royalty obligations to you (and to each member of the Artist if
Artist is a recording group). The royalties set forth in Paragraph 7
and 8 hereof are intended to include provisions for all performers
rendering services in connection with the master recordings. You
hereby indemnify and agree to hold us harmless from any claims for
royalties in excess of those herein provided.

26. As to all matters contained in this agreement to be determined
by mutual agreement between you and us, or as to which your or our approval
or consent is required, you or we shall not unreasonably withhold such
agreement, approval or consent.

27. If, by reason of illness, injury, accident or refusal
to work, you fail to perform for us in accordance with the provi-
sions of Paragraph 2 hereof or, if due wholly or partly to any
labor controversy or adjustment thereof, or to any other cause not
entirely within our control, or which we could not, by reasonable
diligence, have avoided, we are materially hampered in the record-
ing, manufacture, distribution or sale of records, or our normal
business operations become commercially impractical, then, without
limiting our rights in any such event, we shall have the option,
without liability, to suspend operation of Paragraph 2 and/or sub-
paragraph 9(a) of this agreement for the duration of any such con-
tingency by giving you written notice thereof; and at our election,
a period of time equal to the duration of such suspension shall be
added at the end of the then current period of the term hereof, and
then such period and the term of this agreement shall be according-
ly extended.

28. We shall have the right to secure insurance with respect to any of you (including, but not limited to Sammy Strain and/or any other party who might perform on phonograph records and make personal appearances with us as a member of "THE O'JAYS") for your own benefit. In this connection each of you agree to make each of you available for physical examinations by a physician as and when reasonably requested to do so and to complete such questionnaires and other documents which we or any insurance carrier may from time to time require in connection with securing and maintaining such insurance.

29. If any of you leaves or is unable to perform as a member of "THE O'JAYS" for the purpose of recording, we shall have the absolute right to terminate this agreement with no further liability other than for royalties on sales of phonograph records containing your performances. We shall notify you no later than twenty-six (26) days after we have received notice of such member leaving or being unable to perform of our decision to terminate this agreement. Our failure to notify you within said period shall constitute a waiver of such right of termination. In the event that we waive such right in any specific instance(s) and any new member(s) joins the group, the foregoing shall apply in the event any remaining or new member(s) thereafter leaves the group, or is unable to perform as a member of the group in each instance.

30. During said term, you agree to render your services at recording sessions at studios selected by us and at times and places selected by us after consultation with you so that said recording dates, places and times will be consistent with your other personal and professional obligations. Notwithstanding the foregoing, in the event you shall record outside of Philadelphia, Pennsylvania, and as a result of such recording outside of Philadelphia your costs of transportation exceed your normal costs of transportation from Cleveland, Ohio to Philadelphia, then, in such event, we shall bear such excess costs as our sole obligation. Furthermore, and notwithstanding the foregoing, we agree that the first Five Thousand Dollars ($5,000.00) of transportation and living costs incurred in connection with the rendition of your recording services hereunder with respect to any one album shall either be paid directly to us, promptly when due, or in the event you shall have theretofore paid for any such expenses, promptly reimbursed by us to you, and such payment by us shall constitute an additional Accompaniment Cost (as such phrase is defined in the Agreement) in connection with the rendition of your recording services. Any such costs in excess of Five Thousand Dollars ($5,000.00), incurred in connection with any one album hereunder, shall be borne solely by you.

31. We agree to pay you an advance of One Hundred Sixty-six Thousand Dollars ($166,000.00) for each studio long playing album delivered by you to us in a *fourteen* finished and completed form. Said payment shall be made by us to you within ~~thirty~~ (14) days from said delivery.

(a) We agree to pay you the sum of Three Hundred Sixty Thousand Dollars as an advance against any and all advances, royalties, or any other monies due to be paid to you pursuant to this Agreement and/or pursuant to the Agreement dated January 15, 1972 between Walter Williams, Eddie Levert, and William Powell and Gamble-Huff Productions, Inc. as amended on August 25, 1975. It is understood that this advance shall also be an advance against the advances referred to in paragraph 31 above. Said advance shall be paid to you as follows:

(i) One Hundred Ten Thousand Dollars ($110,000.00) has been paid to you by our affiliated, Assorted Music, Inc., on or about March 1, 1977.

(ii) Two Hundred Fifty Thousand Dollars ($250,000.00) to be paid to you on or about May 27, 1977.

(b) Notwithstanding anything to the contrary contained herein, it is agreed and understood that in the event that we make any payment to you of any royalties, advances, and/or any monies whatsoever pursuant to this Agreement or pursuant to the Agreement dated January 25, 1972 between Walter Williams, Eddie Levert, and William Powell and Gamble-Huff Productions, Inc. as amended August 25, 1975, that any such payment shall be deemed to reduce any and all of the advances referred to above. Said reduction to apply to the earliest advances then due.

32. It is agreed and understood by you that one-third (1/3) of any and all advances, royalties, and/or any other monies whatsoever to be paid to you pursuant to this Agreement or to be paid to you pursuant to the Agreement of January 15, 1972 between Walter Williams, Eddie Levert, and William Powell, and Gamble-Huff Productions, Inc. as amended on August 25, 1975 shall be paid by us to a separate savings account to be held by us in escrow until we have obtained a full and final release from William Powell with reference to said funds, or to this Agreement, or to the Agreement of January 15, 1972 between Walter Williams, Eddie Levert, and William Powell, and Gamble-Huff Productions, Inc. as amended August 25, 1975. We agree to forward to you copies of any all deposits, withdrawals, interest credits, other transactions, etc. with reference to said savings account. In the event that for any reason whatsoever the amount of funds placed in said escrow account does not equal one-third (1/3) of said advances, royalties, and/or other monies to be paid to you, (including but not limited to the advances pursuant to paragraph 31), then said deficiency shall be cured from the first available funds to be so paid to you after first providing for the normal one-third (1/3) reduction there-from to be placed in the escrow account.

33. It is agreed and understood by all parties that the provisions of Paragraph 13 shall apply so that you shall indemnify us with reference to any claims whatsoever made by William Powell or any third party for any reason whatsoever, including, but not limited to, this Agreement and the Agreement of January 15, 1972 between Walter Williams, Eddie Levert, and William Powell and Gamble-Huff Productions, Inc. as amended August 25, 1975.

34. It is agreed and understood by all parties that the provisions of paragraph 13 shall apply so that you shall indemnify us from any claims whatsoever by Sammy Strain for any reason whatsoever, including, but not limited to, the use of the voice, picture, likeness, name, biographical material, etc. of Sammy Strain pursuant to the terms and conditions of this Agreement. You further represent and warrant that you own an exclusive recording agreement for the services of Sammy Strain and that you hereby guarantee to us his performance pursuant to the terms and conditions of this Agreement and you further warrant to us that you will make any and all payment to Sammy Strain pursuant to the exclusive recording agreement between you and him and any and all payments that might be claimed by him pursuant to his services for us pursuant to the terms and conditions of this Agreement. You further agree to cause Sammy Strain to execute the letter attached hereto which provides for his signature.

-18-

35. It is agreed and understood between all of the parties hereto that the Agreement of January 15, 1972 between Walter Williams, Eddie Levert and William Powell and Gamble-Huff Productions, Inc. as amended August 25, 1975 shall be deemed to have expired as though the term thereof had been completed. It is agreed between all of the parties hereto that the normal obligations on each of the parties that would continue after the expiration of the term of said Agreement as amended shall remain as obligations on all of said parties.

36. It is understood that the first long playing album to be recorded by you pursuant to the terms of this Agreement shall be "TRAVELIN' AT THE SPEED OF THOUGHT" Philadelphia International Records #PZ34684.

37. ~~You agree to reimburse us for one-half (½) of any and all costs expended by us, either directly or indirectly, with reference to the securing of your appearance on any television shows or personal appearances.~~

38. This agreement sets forth the entire agreement between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement or any other provision thereof shall be binding upon us unless confirmed by a written instrument signed by an officer of our company. No waiver of any provision of or default under this agreement shall affect our rights or remedy in the event of any other default, whether or not similar. The validity, construction and effect of this agreement, and any and all extensions and/or modifications thereof, shall be governed by the laws of the Commonwealth of Pennsylvania.

Very truly yours,

Assorted Music Inc   P/o/s Phila Internal
~~GAMBLE HUFF PRODUCTIONS~~   Records

By _Kenneth Gamble_

ACCEPTED AND AGREED:

_Eddie Levert_
EDDIE LEVERT

_Walter Williams_
WALTER WILLIAMS

PIR 959

# EXHIBIT "H"

ASSORTED MUSIC, INC.
d/b/a PHILADELPHIA INTERNATIONAL RECORDS
309 South Broad Street
Philadelphia, PA 19107

March 2, 1979

Eddie Levert
Walter Williams
p/k/a "The O'Jays"

12608 Miles
Cleveland, OH 44105

c/o Eddie Levert
3304 Warrington
Cleveland, OH 44120

Dear Messrs. Levert and Williams:

The following, when signed by you and us, will constitute
the agreement between you and us, pursuant to which you will
perform exclusively for us as recording artists, upon the
terms and conditions herein set forth:

1.a.   This agreement shall commence as of March 1,
1979 and shall continue in force for a term which shall con-
sist of an initial period ending on May 1,    1983 (unless
extended and/or suspended as provided herein).

b.   You grant us three (3) consecutive options to
extend the term of this agreement for a period of ten (10)
months each ("Option Periods") upon all of the terms and con-
ditions herein contained.  Each such option shall be deemed
to be automatically exercised by us unless we notify you in
writing, at least thirty (30) days prior to the expiration
of the then current period of the term of this agreement,
that this agreement shall terminate upon the expiration of
such period.

c.   Effective upon the execution of this agreement,
the term of the agreement between you and us dated as of
March 15, 1977 (the "1977 Agreement") is hereby terminated
as of the date hereof and all parties shall be deemed to have
fulfilled all of their obligations thereunder, except those
which survive the end of the term (e.g., warranties, re-record-
ing restrictions and royalty payments).  Thereafter, you shall
have no further obligation to record and/or deliver any phonograph
records which you were to record and/or deliver pursuant to the
1977 Agreement or any other agreement between you and us, but

which you have not recorded and/or delivered heretofore; and
we shall have no obligation (i) to record and/or release any
phonograph records which we may have agreed to record and/or
release under the 1977 Agreement or any other agreement be-
tween you and us, but which have not been recorded and/or
released heretofore, or (ii) to make advances and/or any
other payments to you with respect to any phonograph records
which we may have agreed to record pursuant to the 1977 Agree-
ment or any other agreement between you and us, but which have not
been made heretofore; provided, however, that clause (ii) of
this subparagraph shall not be deemed to terminate our obli-
gation to pay royalties to you in accordance with the terms
and conditions of the 1977 Agreement or any other agreement
between you and us with respect to sales of phonograph records
derived from master recordings recorded under any such agree-
ment, subject to the recoupment of all advances chargeable
against such royalties.

2. During the term of this agreement you shall render
your services as recording artists to us for the purpose of
recording the following minimum number of phonograph albums,
which, in the United States, we shall first release on the
Philadelphia International Records label or any other label
on which we first release phonograph records recorded by a
majority of our top-selling recording artists.

    a. Initial period - 5 studio albums (at the
rate of one such album every ten months
during such initial period).

    b. First Option Period - 1 studio album.

    c. Second Option Period - 1 studio album.

    d. Third Option Period - 1 studio album.

During the term of this agreement, you will render
services to us for the purpose of making phonograph records
at studios selected by us and reasonably approved by you and
at times to be designated by us, provided that in no event
shall you be obligated to commence the recording of any
studio album more frequently than once every ten (10) months
during the term. The studio presently located at our offices
in Philadelphia, Pennsylvania, and any other studios which
we may use regularly in lieu of such present studio shall be deemed
to be approved by you. All musical compositions to be recorded by
you hereunder shall be selected by us and the actual producers of the
master recordings made hereunder, and each such master recording
shall be subject to our approval as technically satisfactory for
the manufacture and sale of records.

~~to our approval as technically satisfactory for the manufac-~~
~~ture and sale of records.~~
*E.L.*

3. During the term of this agreement, by written notice
to you, we shall have the option to increase the minimum num-
ber of albums which you shall record as follows:

  a. Initial Period - 1 "live" album.

  b. First Option Period - 1 "live" album.

  c. Second Option Period - 1 "live" album, if
   we do not record 1 "live" album during the
   first Option Period.

  d. Third Option Period - 1 "live" album, if
   we do not record 1 "live" album during the
   First and Second Option Periods.

4. During the term of this agreement, you will not
perform for the purpose of making phonograph records or
master recordings for any person other than us. In addition,
you shall not perform any musical composition which shall
have been recorded hereunder for any person other than us
for the purpose of making phonograph records or master re-
cordings prior to whichever of the following dates shall be
later: (a) the date five years subsequent to the date such
composition is recorded hereunder; (b) two years subsequent
to the expiration of the term hereof. It is agreed between
you and us that your services are of a special, unique,
unusual and extraordinary character, involving skill of the
highest order, which gives them a peculiar value, the loss
of which cannot be reasonably or adequately compensated by
damages in an action at law, and that your breach of any of
the provisions contained in this agreement shall cause us
irreparable damage and injury. You hereby expressly agree
that we shall be entitled to injunctive and/or other equitable
relief to prevent or cure any breach or threatened breach of
this agreement by you or enforce the provisions of this
agreement.

5. All master recordings recorded hereunder and all
matrices and phonograph records manufactured therefrom,
together with the performances embodied thereon, shall be
entirely our property, free from any claims whatsoever by
you or any person deriving any rights or interests from you.
Without limiting the generality of the foregoing, we and/or
our subsidiaries, affiliates and licensees shall have the
unlimited right, from time to time, to manufacture, by any
method now or hereafter known, phonograph records and other

reproductions, on any mediums or devices now or hereafter known, of the master recordings made hereunder, and to sell, transfer or otherwise deal in the same throughout the world under any trademark, trade name, and label, or to refrain from such manufacture, sale and dealing.

6.    We will pay all talent costs, including, without limitation, all costs of instrumental, vocal and other personnel and arrangements and copying which we specifically approve in respect of the recording of master recordings hereunder, and all other amounts which we are required to pay pursuant to any applicable law or collective bargaining agreement.  All such amounts, plus all other amounts which represent direct expenses paid by us or incurred in connection with the recording of master recordings hereunder, including, without limitation, all studio and engineering charges, are sometimes referred to herein as "Recording Costs" and shall constitute advances against any royalties which may become payable to you under this agreement, the 1977 Agreement or any other agreement between you and us or between you and Gamble-Huff Productions relating to recordings embodying the performances of The O'Jays, except that any Recording Costs paid or incurred in connection with the recording of more than fourteen (14) sides for any single studio album project shall not constitute advances and shall not be charged against your royalties without your written approval, it being specifically agreed that any such recording of more than fourteen (14) sides in connection with any such project shall not constitute a material breach of this agreement.

7.    Upon your execution of this agreement, we shall pay you an advance of Five Hundred Thousand Dollars ($500,000). Thereafter, if you are not in default of any material provision of this agreement, we also shall pay the following advances to you:

a.    (i) One Hundred and Seventy-Five Thousand Dollars ($175,000) within fourteen (14) days after the inception of the recording of master recordings for each studio album recorded hereunder;

(ii) Three Hundred and Twenty-Five Thousand Dollars ($325,000), less all Recording Costs not previously charged against your advances hereunder, within thirty (30) days after the delivery of master recordings for each such studio album;

b.    Notwithstanding subparagraph 7.a. to the contrary the advance for the fourth and/or fifth studio albums recorded during the initial term hereof (as such initial term may be suspended or extended) and any studio album recorded during

any Option Period hereunder ("Option Studio Album") shall be computed and paid to you pursuant to paragraph 7.a. hereof unless: (i) you have earned $3,000,000 from royalties derived from the sale of recordings recorded hereunder and/or from advances actually paid to you or on your behalf hereunder (including Recording Costs; and (ii) royalties earned by you as the result of sales of the studio album released immediately prior to the studio album for which the advance is to be computed and paid ("the immediately preceding Studio Album") have not been sufficient to recoup all advances (including Recording Costs) paid to you or on your behalf in respect of the immediately preceding Studio Album. In such event, such advance shall be reduced to an amount equal to the royalties earned by you in respect of the immediately preceding album, as of the inception of recording such fourth, fifth and/or Option Studio Album (the "Reduced Studio Album Advances"). Such Reduced Studio Album Advances shall in no event be less than $200,000 (including Recording Costs) for the fourth or fifth studio album, $250,000 (including Recording Costs) for the first Option Studio Album, $300,000 (including Recording Costs) for the second Option Studio Album and $350,000 (including Recording Costs) for the third Option Studio Album, and shall be deemed payable to you, after deducting therefrom all Recording Costs not previously charged against such advance, within thirty (30) days after the delivery of master recordings for the particular studio album. The term "royalties earned by you" as used in this subparagraph 7.b. and subparagraph 7.c. below only, shall mean royalties credited or accrued to your royalty (artist or producer) account without any deduction whatsoever, except for a ̶l̶i̶a̶b̶i̶l̶i̶t̶y̶ reserve, not to exceed, for the purpose of this subparagraph 7.b. only, fifteen percent (15%) of royalty bearing records shipped.

onable

    c.   The Recording Costs for each "live" album recorded hereunder will be equally divided between you and us.  We will pay one-half (1/2) of such Recording Costs pursuant to paragraph 6 hereof and the remaining one-half (1/2) will be charged against your royalty (artist ̶a̶n̶d̶/̶producer) account. ̶S̶u̶c̶h̶/such Recording Costs shall be charged against and recouped from any and all royalties which may become payable to you under this agreement, the 1977 Agreement, or any other agreement between you and us or between you and Gamble-Huff Productions (in respect of recordings featuring the performances of "The O'Jays).  Within fourteen (14) days following the release of any such "live" album, we will pay an advance to you in the amount of:

The balance

    (1) $50,000, if your royalty account (artist ̶a̶n̶d̶ or producer) is in an unrecouped position; or

    (2) $100,000, if such royalty account is in a recouped position.

    d.   All advances (including Recording Costs) paid to you or on your behalf under this agreement shall be charged against and recouped from any and all royalties which may become payable to you under this agreement, the 1977 Agreement, or any other agreement between you and us or between you and

ꭡꮅ

Gamble-Huff Productions, in respect of recordings featuring
the performances of "The O'Jays"), except that: a Fifty
Thousand Dollar ( $50,000) portion of the aggregate advance
(including Recording Costs), which is paid to you or on your
behalf in respect to each of the first five (5) studio albums
recorded hereunder shall not be charged against or recouped
from any such royalties; and the $500,000 advance payable to
you upon the execution of this agreement and the advances
payable to you with respect to the First Studio Album to be
recorded by you hereunder pursuant to subparagraph 7.a. hereof,
which also shall be charged against and recouped from such
royalties, shall not be charged against or recouped from that
portion of such royalties earned by you (including royalties
withheld on account of reserves) during the semi-annual account-
ing period ending December 31, 1978.

8.   You will be paid royalties on Net Sales of Phonograph
Records derived from Masters recorded hereunder as hereinafter
set forth:

     a.   We will pay you a basic royalty, computed at the
applicable percentage indicated below, of the applicable Royal-
ty Base Price in respect of Net Sales of Phonograph Records
consisting entirely  of Masters recorded hereunder and sold
by us or our licensees through Normal Retail Channels for
distribution in the United States:

          (i) On Albums:  20%

          (ii) On 45 r.p.m. "single" Records:  14%

     b.   In the event that aggregate Net Sales in the
United States of any Phonograph album (in disc or tape form)
derived from masters recorded hereunder exceed 1,500,000 units,
the basic album royalty rate set forth in subparagraph 8.a.(i)
hereof shall be increased by two percent (2%) of the applicable
royalty base price only with respect to sales in the United States of
that particular album which are in excess of 1,000,000 units.

     c.   The royalty rate on Phonograph Records sold
through any Club Operation shall be determined by multiplying
the otherwise applicable royalty rate by a fraction, the numer-
ator of which is five (5) and the denominator of which is
twenty (20), computed on the basis of ninety percent (90%)
of Net Sales of such Records.  Notwithstanding the foregoing,
no royalty shall be payable to you with respect to (i)
Phonograph Records received by members of any such Club
Operation in an introductory offer in connection with joining
it or upon recommending that another join it or as a result
of the purchase of a required number of Records including,
without limitation, records distributed as "bonus" or "free"
Records, or (ii) Phonograph Records for which such Club
Operation is not paid; provided, however, that such royal-
ties shall be deemed payable to you to the extent that we are
paid (or credited with) royalties on such Phonograph Records.

- : -

d. The royalty rate on Phonograph Records sold to educational institutions, libraries or other entities for promotion or sales incentive purposes (but not for sale to the general public through normal retail channels) shall be one-half (1/2) of the royalty rate otherwise payable and royalties shall be computed on the basis of the actual sales price therefor (less all taxes and container charges).

e. In respect of Phonograph Records derived from Master recordings which are leased by us or our licensees to others for their distribution of Phonograph Records in or outside the United States or any other use of such Masters which is not otherwise provided for herein, 33 1/3% of our net receipts therefrom (after the deduction of all copyright, AFM and other applicable third party payments) will be paid to you.

f. The royalty rate on Phonograph Records sold in the form of pre-recorded tape shall be the same as the applicable royalty rate which would have been payable to you if such Records were sold in disc form.

g. The royalty rate on any Budget Record, or Record bearing a Reissue Label, shall be one-half (1/2) of the otherwise applicable royalty rate, and the royalty rate on any twelve-inch "disco single" shall be the same as the applicable royalty rate for "Single" records.

h. The royalty rate on Phonograph Records sold by us or our licensees for distribution outside of the United States of America shall be one-half (1/2) of the applicable royalty rate which would have been payable to you if such Records were sold for distribution in the United States: provided that if (1) you conduct a public relations and/or public appearance tour of at least three of the four other major foreign territories in which our Records are distributed (The United Kingdom, France, Germany and Italy); and (ii) the royalty rate presently payable to us (together with the royalty rate payable to our production affiliate or any successor to such production affiliate) by our distributor on phonograph records sold for distribution outside of the United States (presently 20% of 90% of the wholesale price) increases, then commencing on the date that any such increase becomes effective or the date on which you commence such tour, whichever first occurs, we shall increase the royalty rate first referred to in this subparagraph to three-quarters (3/4) of the otherwise applicable royalty only with respect to Europe, but in no event shall such increase of your royalty rate, on a territory by territory basis, exceed 50% of the increased royalty rate, received by us, on a territory by territory basis; and further provided that if (iii) you conduct a public relations and/or public appearance tour of Japan and at least three of the four other major foreign territories in which our Records are distributed (The United Kingdom, France, Germany and Italy); and (iv) the royalty rate presently payable to us (together with the royalty rate payable to our production

E, 2.

PIR 966

affiliate or any successor to such production affiliate)
by our distributor on phonograph records sold for distri-
bution outside of the United States (presently 20% of 90%
of the wholesale price) increases, then commencing on the
date that any such increase becomes effective or the date on
which you commence such tour, whichever first occurs, we
shall increase the royalty rate first referred to in this
subparagraph to three-quarters (3/4) of the otherwise appli-
cable royalty with respect to the rest of the world, but
in no event shall such increase of your royalty rate, on
a territory by territory basis, exceed 50% of the increased
royalty rate, received by us, on a territory by territory
basis.  Your royalty shall be computed on the basis of ninety
percent (90%) of net sales, unless we are paid on the basis
of one hundred percent (100%) of net sales.  In such event,
your royalty will be computed on the basis of one hundred
percent (100%) of net sales.

9.  Notwithstanding anything to the contrary contained
in paragraph 8 hereof:

a.  The royalty rate on Phonograph Records containing
Masters recorded under this agreement and other Master Record-
ings will be computed by multiplying the royalty rate otherwise
applicable by a fraction, the numerator of which shall be the
number of Sides embodying Masters recorded hereunder and the
denominator of which shall be the total number of Master
Recordings on the particular Record.

b.  The royalty rate on Joint Recordings shall be
computed by multiplying the royalty rate otherwise applicable
by a fraction, the numerator of which shall be one (1) and
the denominator of which shall be the total number of artists
entitled to receive royalties with respect to their services
in connection with such recording; provided that we shall not
cause you to record Joint Recordings without your prior
written consent.  The portion of the Recording Costs for
Joint Recordings chargeable against your royalties will be
computed by multiplying the aggregate amount of such Recording
Costs by the fraction referred to in the preceding sentence.

c.  No royalties shall be payable to you in respect
of Phonograph Records sold or distributed by us, our affiliates
or Licensees for promotional purposes, as cutouts after the
listing of such Records has been deleted from our catalog as
"free", "no charge" or "bonus" Records (whether or not intended
for resale), or to radio stations.  No royalties will be pay-
able to you on "sampler" Records in tape form intended for
free distribution to automobile purchasers and containing not
more than one Recording made under this agreement.

10.  In respect of the royalties provided for herein:

a.  We will compute royalties payable to you here-
under within ninety (90) days after June 30 and after
December 31 of each year during which records made hereunder
are sold for the preceding six (6) month period, and will
render accountings for and pay such royalties, except as
provided in paragraph 17 hereof, less any unrecouped advances.

under this and/ any other agreement between you and us
within such ninety (90) days except with respect to sales
of records upon which royalties are payable to us by a dis-
tributor thereof. We will be responsible for payment of
your royalties on such sales only after receipt by us from
such distributor of the royalties applicable to such sales.
We will have the right to hold reasonable reserves against
returns and exchanges not exceeding twenty-five percent

royalty___ (25%) of all ~~xxxxxx~~ bearing Records shipped during the corres-~~£,£~~ ,
ponding accounting period. ~~Each xxxxxxxxxx~~ will be prorated ~~,~~ Returns
between "free" and royalty bearing records in the same manner
as originally shipped ~~and~~ liquidated within one (1) year after
the date established. .                    Reserves will be

b. Royalties for Records sold for distribution
outside of the United States of America ("foreign sales")
shall be computed in the national currency in which we are
paid by our licensees and shall be paid by us to you at the
same rate of exchange as we are paid; provided, however, that
royalties on foreign sales of records shall not be due and

royalties payable until we have received payment therefor in the United
States, or until such ~~royalty~~ have been credited to our
account. If we do not receive payment in United States
dollars in the United States and elect to accept payment in
a foreign currency in a foreign country, royalties payable
to you may be deposited to your credit (and at your expense)
in such foreign currency in a foreign depository. Such
deposit shall fulfill our obligation hereunder as to foreign
sales to which such royalty payments are applicable and we
shall notify you of such deposit promptly.

c. At any time within two (2) years after any royalty
statement is rendered to you hereunder, you shall have the
right to give us notice of your intention to examine our books
and records with respect to such statement. Such examination
may be made, at your sole cost and expense, by any certified
public accountant or attorney designated by you. Such exami-
nation shall be made during our usual business hours at the
place where the books and records which relate to you and which
are necessary to verify the accuracy of the statement or
statements specified in your notice to us are located, and
your examination shall be limited to such books and records.

d. Your sole right to inspect our books and records
shall be as set forth in subparagraph c. hereof, and we shall .
have no obligation to produce such books and records more
than once with respect to each statement rendered to you.
Without limiting the generality of the foregoing, we shall
have no obligation to furnish you with any records relating
to you which our distributor will not furnish to us.

e. Unless notice shall have been given to us as
provided in subparagraph c. hereof, each royalty statement
rendered to you shall be final, conclusive and binding on
you and shall constitute an account stated. You shall be
foreclosed from maintaining any action, claim or proceeding
against us in any forum or tribunal with respect to any
statement or accounting due hereunder unless such action,
claim or proceeding is commenced against us in a court of
competent jurisdiction within three (3) years after the date
on which such statement is rendered.

11. a.   You warr t and represent that you wn all rights
in and to the name "THE O'JAYS" (hereinafter so. times referred
to as the "Name") and that you have the sole and exclusive
right to use and to allow others to use the Name in connec-
tion with the manufacture, advertising and sale of phonograph
records.   You hereby grant to us, and further warrant and
represent, that we shall have the right to use and to allow
others to use the Name and your individual names for advertis-
ing and purposes of trade and otherwise without restriction
in connection with the phonograph records made pursuant to
this agreement and in advertisements for our company, its
artists and products, including, without limitation, the
Compositions recorded hereunder.

b.   We shall have the world-wide right in perpetuity
to use and to allow others to use your name (both legal and
professional) and likeness and biographical material concerning
you for advertising and purposes of trade, and otherwise
without restriction in connection with the phonograph records
made pursuant to this agreement and in advertisements for our
company, its artists and products, including, without limita-
tion, the Compositions recorded hereunder.   We shall not
use or authorize any direct endorsement by you of any record
or performance without your prior written consent.   We shall
have the further right to refer to you by your names as our
exclusive Recording Artists and you shall, in your activities
in the entertainment field, use your best efforts to be
billed and advertised as our exclusive Artists.   During the
term of this agreement, you shall not endorse or authorize
your name or likeness to be used in connection with the ad-
vertising or sale of products in the same category as those
which are currently manufactured and sold by or for us.

c.   Without limiting the provisions of subparagraph
11.b. hereof, you hereby grant to us, during the term of this
agreement, the non-exclusive right, throughout the world, to
authorize the use of your name and/or likeness and/or biographi-
cal material concerning you, whether alone or in conjunction
with other elements, in connection with the sale, lease, license
or other disposition of any Composition owned, in whole or — and/or
in part, and/or administered by any of our publishing affili- administered
ates.

12. a.   In the event that during the term of this agree-
ment any of you shall leave the group identified with the Name
and/or shall cease to perform as a member of such group, you
shall promptly give us notice in writing to such effect and
in the event we shall deem it advisable, such leaving member
shall be replaced by a new member who shall be mutually accept-
able to you and to us; and the name of such new member shall
thereafter be deemed substituted in this agreement in the place
of such leaving member, and such new member, by performing
hereunder, shall automatically be bound by all terms and
conditions of this agreement.   Such leaving member shall there-
after be relieved from further performances hereunder with
the group, but shall continue to be bound individually by all
applicable provisions of this agreement and, upon our request
therefore, the remaining members of the group will duly cause
any such new member to execute and deliver to us any document
which we deem necessary or expedient to effectuate the purpose

or intent of the foregoing sentence. In the event that we do not deem it advisable to replace any leaving or non-performing member of the group, we shall have the right to terminate this Agreement, at our sole discretion, with no further liability other than for the payment of royalties on sales of phonograph records previously recorded hereunder. If we elect to so terminate this agreement, we shall notify you within sixty (60) days after we have received notice that any member of the group has left or ceased to perform.

b. You warrant and represent that, in the event any one or more of you shall so leave the group as provided in subparagraph 12. a: hereof, we shall have, and you and each of you does hereby grant to us, an irrevocable option on your individual and exclusive services for the purpose of making phonograph records. Such option, with respect to any such leaving member, may be exercised by us by giving such leaving member notice in writing within sixty (60) days after our receipt of the notice provided for in said subparagraph 12. a.; and, in the event of our exercise of such option, such leaving member shall execute our then current standard form of term recording contract containing the following provisions:

(1) a term consisting of not less than the remaining balance of the term of this agreement as it may be extended by our exercise of the options granted to us herein;

(ii) a minimum of four (4) 45 r.p.m. record sides or their equivalent for which satisfactory master recordings will be performed and recorded during each period of such term, it being understood and agreed that if the remaining balance of the term of this agreement shall be less than six (6) months, then the minimum number of such 45 r.p.m. record sides for which master recordings will be performed and recorded during such remaining balance of the term shall be one-half (1/2) of the foregoing number;

(iii) a royalty in respect of phonograph records embodying performances recorded during such term at one-half (1/2) of the rates set forth herein; and

(iv) a payment for services rendered at each recording session at the rate of union scale, which payments shall constitute advances chargeable against all royalties under this or any other agreement between you and us.

In the event that during the term of this agreement the group shall completely disband, you shall promptly give us notice in writing to such effect, and, in such event, the provisions of this subparagraph 12. a. shall be applicable with respect to each member of the group.

-15-

c. Your duties, liabilities, obligations, warranties, representations, authorizations and agreements contained in this agreement are joint and several, and all references herein to "you" and "your" shall include all of you (including the late William Powell where reference is made to certain prior Agreements between you and us to which he was a party) inclusively and each of you individually, unless otherwise specified.

13. a. You will not, at any time, manufacture, distribute or sell or authorize or knowingly permit the manufacture, distribution or sale by any person other than us of phonograph records embodying:

(i) any performance rendered by you during the term of this agreement; or

(ii) any performance rendered by you within two (2) years after the expiration of the term of this agreement or five (5) years after the date you record any musical composition hereunder, whichever first occurs.

b. You will not record or authorize or knowingly permit to be recorded for any purpose any such performances without in each case taking reasonable measures to prevent the manufacture, distribution and sale at any time by any person other than us of phonograph records embodying such performances. Specifically, without limiting the generality of the foregoing, you agree:

(i) if, during the term of this agreement you perform for the purpose of making transcriptions for radio or television or soundtracks for motion picture films; or

(ii) if, within two (2) years after the expiration of the term of this agreement or five (5) years after the date you record any musical composition hereunder, whichever first occurs, you perform for any such purpose any composition which shall have been recorded pursuant to this agreement;

you will do so only pursuant to a written contract containing an express provision that neither such performance nor any recording thereof will be used, directly or indirectly, for the purpose of making phonograph records. You will promptly furnish to us, at our office, a copy of the pertinent provisions of each such contract and will cooperate fully with us in any controversy which may arise or litigation which may be brought relating to our rights under this subparagraph.

14. We may, at our election, assign this agreement or any of our rights hereunder to any subsidiary, division or affiliate of ours, or to any person owning or acquiring all or a substantial portion of our stock or assets; provided, however, that no such assignment shall be deemed to relieve us of our obligations hereunder to the extent that any such obligations are not performed by our assignee.

---

-17-

15.  a.   At our election, each Controlled Composition recorded pursuant to this or any other agreement between you and us shall be licensed to us at the then current minimum compulsory license rate applicable under the copyright law of the country concerned in effect as of the date of the inception of the recording embodying such composition on the basis of one hundred percent (100%) of Net Sales of records, except that:   (i) With respect to records sold and/or distributed as "bonus" or "free" records through any "Club Operation" (as defined in subparagraph 8.c. of this agreement), the royalty rate shall be three-quarters (3/4) of the said rate; (ii) no copyright royalties shall be payable with respect to records described in subparagraph 9.c. hereof; and (iii) the applicable minimum compulsory license rate shall be that which is in effect on the date of recording if we are paid on that basis. Arranged versions of musical compositions in the public domain, when furnished by you or any Person described in subparagraph 22.g. below for recordings hereunder, shall be free of copyright royalties.  Any assignment of the ownership or copyright in, or right to license the use of, any such composition or in any such arranged version of a musical composition  in the public domain shall be made subject to the provisions hereof. In the event we are required to pay mechanical copyright royalties in excess of those provided in this subparagraph 15.a. we shall have the right to charge such excess against all royalties or other sums payable to you hereunder; provided (1) that you control the production of the particular phonograph record embodying the Controlled Composition in respect of which we are required to pay such excess royalties and (2) if you do not control such production, only that portion of such excess which is attributable to the Controlled Compositions.

b.   The copyrights for, and the ownership of, any Controlled Compositions recorded hereunder shall be divided equally between your designee and our publishing affiliate, so that 50% thereof shall be held by your designee and 50% by our publishing affiliate.  Our publishing affiliate shall administer any such copyrights, but shall not charge any administration fee for such services.  In all other respects, your designee and our publishing affiliate shall separately administer their respective one-half interests in any such Controlled Compositions and your publishing designee shall have the right to receive its share of the writer's and publisher's share of income derived from the exploitation of the applicable compositions directly from source.

c.   Notwithstanding the foregoing, we shall not be required to pay an aggregate copyright royalty in excess of the applicable amount indicated below, such amount to be multiplied by a fraction, the numerator of which is the number of Sides on the Record recorded hereunder and the denominator is the total number of Sides on the Record:

(i) On Single-Record Albums:  10 times  the applicable minimum compulsory license rate referred to in the first sentence of subparagraph 15.a. hereof ("the applicable minimum rate") on Records sold for distribution in the United States and Canada.

PIR 972

(ii) On Multiple Record Sets: 15 times the applicable minimum rate on Records sold for distribution in the United States and Canada.

(iii) On 12-inch "Disco Single" Records: 2.9 times the applicable minimum rate on Records sold for distribution in the United States and Canada.

(iv) On "single" Records: 2 times the applicable minimum rate on Records sold for distribution in the United States and Canada.

16. You warrant and represent:

a. You have the right and power to enter into and fully perform this agreement.

b. You have the right to and herewith authorize us to use the name, vocal performances, recording services, picture, likeness and biographical information of Sammy Strain in connection with the recording, manufacture and distribution of phonograph records pursuant to this agreement. You are parties to and owners of a Recording Agreement for Sammy Strain's exclusive services as a recording Artist and warrant and guarantee that you will furnish his recording services to us during the term of this agreement (including any extensions and/or suspensions), and pursuant to the terms and conditions of this agreement, for the purpose of recording, manufacturing and distributing phonograph records and will be solely responsible for, and will make, all payments to Sammy Strain which may become due to him in connection with phonograph records recorded under this agreement or any other agreement between you and us.

c. We shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of any rights by us pursuant to this agreement except as specifically provided herein.

d. You are or will become and will remain to the extent necessary to enable the performance of this agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required for the performance of your services hereunder.

e. No materials, as hereinafter defined, or any use thereof, will violate any law or infringe upon or violate the rights of any Person. "Materials", as used in this subparagraph, means: (i) all Controlled Compositions made hereunder, and used by you in connection with Recordings made hereunder, and (ii) each name (iii) all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by you and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

f. In the event that you shall become aware of any unauthorized recording, manufacture, distribution or sale by third party contrary to the foregoing re-recording restric-

PIR 973

tions, you shall notify us thereof and fully shall cooperate with us in the event that we commence any action or proceeding against such third party.

g. You will at all times indemnify and hold us and any of our Licensees harmless from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, which are inconsistent with any warranty or agreement made by you herein. You will reimburse us and/or our Licensees on demand for any payment made at any time after the date hereof in respect of any such claims, damages, liabilities, costs and expenses, and we may retain any sums whatsoever to be paid to you hereunder or under any other agreement between you and us or between you and Gamble-Huff Productions for said reimbursement; provided, however, that we shall not make any such payment without your written consent unless such payment is made pursuant to a judgment issued by a court of competent jurisdiction.

17. a. If at any time you fail, except solely for our refusal without cause to allow you to perform, to fulfill your Recording Commitment pursuant to paragraphs 2 and 3 hereof and within the times set forth herein, then, without limiting such rights, we shall have the option, exercisable by notice to you, to suspend (1) our obligation to make any payments to you under paragraphs 7, 8, 9 and/or 10 hereof for the period of the default and/or (2) the running of the then current Period of the term of this agreement (and extend its expiration date) for the period of the default plus such additional time as is necessary so that we shall have not less than ninety (90) days after completion of your Recording Commitment within which to exercise our option, if any, to extend the term for the next Contract Period.

b. If any suspension hereunder results from your refusal to perform, unless: (i) such refusal is excused by reason of a physical or mental disability confirmed by a licensed physician reasonably approved by us; or (ii) you notify us in writing within 75 days following your receipt of such notice of suspension that you are ready, willing and able to appear at recording sessions to fulfill your recording commitment within 45 days following your such notice to us or at such later date as we may request, then, without limiting any of our rights or remedies, we shall have the option by giving you notice to require you to pay to us within ten (10) days of such notice, a sum equal to the full unrecouped amount of any deficit balance then existing in your royalty (artist and producer) account. In the event that you default with respect to the prompt payment of said deficit balance, and fail to remedy or cure any such default within ten (10) days after such notice, you hereby authorize and empower any attorney designated by us to appear for and confess judgment against you in any court of competent jurisdiction for any and all sums which become due under this subparagraph, and waive stay of execution and/or any stay or exemption law of any state now in force or hereafter enacted, and further agree:

(1) if a copy of this agreement, verified by affidavit, is filed in such action, it shall not be necessary to file the original agreement as a warrant of attorney; (2) the authority and power to appear for and enter judgment against you shall not be exhausted by the initial exercise thereof, and the same may be exercised from time to time and as often as is deemed necessary or desirable; (3) waive presentment, demand, protest, and notice of protest and hereby agree to pay all court costs and reasonably attorneys' fees.

b.   If we refuse to allow you to commence recording in order to fulfill your Recording Commitment during any ten month period of the initial contract period or during any option period and if, after thirty (30) days following the expiration date of such applicable period you notify us of your desire to commence such recording in order to fulfill such Recording Commitment, then we shall permit you to commence such recording by notice to you to such effect within sixty (60) days of our receipt of your notice.  Should we fail to give such notice, you shall have the option to terminate the term of this agreement by notice given to us after thirty (30) days following the expiration of such sixty-day period; on receipt by us of such notice the term of this agreement shall terminate and all parties shall be deemed to have fulfilled all of their obligations hereunder except those obligations which survive the end of the term (e.g., warranties, re-recording restrictions and obligation to pay royalties). In full settlement of our obligation in connection therewith, we shall pay to you an Advance in the amount equal to:



(1) The aggregate of the applicable advances (fixed in subparagraph 7.a. inclusive) for each Album then remaining to be recorded to fulfill the minimum Recording Commitment during the Contract Period (i.e., initial period or option period) in respect of which such termination occurs,

less:

(2) The average amount of the Recording Costs for the last two (2) Albums recorded hereunder (or, if only one Album has been recorded, the amount of the Recording Costs for that Album);

multiplied by:

(3) The number of such Albums to be recorded to fulfill the minimum Recording Commitment during the applicable contract period in respect of which such termination occurs,

less:

(3) The aggregate of all advances, royalties and/or any other payment of any kind whatsoever earned by you pursuant to any other recording agreement between you and any other Person during the term that would have remained under this agreement but for the early termination by you pursuant to this paragraph 17.b., it being specifically agreed that you shall use your best efforts to enter

a
into recording agreement with a major and reputable recording company immediately following the termination of this agreement pursuant to this subparagraph 17.b.

Any such advance shall be paid to you in four (4) equal semi-annual installments, commencing within six (6) months of the termination of this agreement and concluding two (2) years after such termination. In the event that you fail to give us either notice within the period specified therefor, we shall be under no obligation to you whatsoever for failing to permit you to fulfill such minimum recording commitment.

c. If because of: act of God; inevitable accident; fire; lockout, strike or other labor dispute; riot or civil commotion; act of public enemy; enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign); failure of technical facilities; failure or delay of transportation facilities, illness or other incapacity of any performer (other than you) or producer (other than you) or other cause of a similar or different nature not reasonably within our control, we are materially hampered in the recording, manufacture, distribution or sale of records, then, without limiting our rights, we shall have the option by giving you notice to suspend the then current Contract Period for the duration of any such contingency plus such additional time as is necessary so that we shall have no less than thirty (30) days after the cessation of such contingency in which to exercise our option, if any, for the next following option period. In the event of such suspension, royalties due to you shall be paid unless the contingency causing the suspension actually prevents us from so paying you. In such event your royalties shall be paid to you as soon as is practicable following the cessation of the contingency preventing such payment. Any such extension of the then current Contract Period, due to a labor controversy or adjustment thereof which involves only us or our record distributor, shall be limited to a period of six (6) months.

18. We shall have the right to secure insurance with respect to you and Sammy Strain and/or any other person who may perform on phonograph records and make personal appearances with you as a member of "THE O'JAYS". In this connection each of you agree to make yourselves and Sammy Strain

available for physical examinations by a physician as and when
reasonably requested to do so and to complete such question-
naires and other documents which we or any insurance carrier
may from time to time require in connection with securing and
maintaining such insurance.

19. At the end of the term hereof, including any exten-
sions and/or suspensions, you hereby grant to us the right to
offer to you a recording agreement based on the same terms and
conditions as any valid recording agreement offered to you in
good faith by any then existing international recording com-
pany. You agree to notify us in writing of any such offer,
and if within sixty (60) days from the date of such notice we
present to you a similar offer, then said offer by us will be
deemed to be automatically accepted by you. If we do not
make said offer to you, then you will be allowed to enter
into said agreement with said other company; provided that:

a. The terms and conditions thereof have not been
changed from those contained in your notice to us;

b. Said contract was entered into within sixty
(60) days after our failure to make said offer to you; and

c. You immediately forward to us a copy of said
fully signed agreement.

(Otherwise, our rights as contained herein shall continue.)·

20. No failure by us to perform hereunder, and no act
or failure to act shall be deemed a material breach of this
contract unless you shall first deliver to us, and to the
record company principally distributing our recordings in
the United States, a written notice specifying the alleged
failure to perform or the alleged failure to act constituting
such material breach, and we shall have failed to cure any
such material breach within thirty (30) days after receipt
by us of such notice from you. In the event we do not cure
any such breach within the said thirty (30) day period, then
it is specifically understood and agreed that this agreement
may be assigned to the record company distributing your
recordings in the United States, and such record company shall
have an additional thirty (30) days within which to cure
said material breach in such event.

21. As to all matters contained in this agreement to be
determined by mutual agreement between you and us, or as to
which your or our approval or consent is required, you or we
shall not unreasonably withhold such agreement, approval or
consent.

22. As used in this agreement the following terms shall
have the meanings set forth below:

a. "Advance" - amount recoupable by us from royal-
ties to be paid to you or on your behalf pursuant to this or
any other agreement;

b. "Album" - one or more twelve-inch 33 1/3 r.p.m.
records, or the equivalent thereof, sold in a single package,
including all Sides, whether or not released, which are record-
ed in connection with a specific album project, but not including
Sides which were recorded in connection with any other album
project. (A "disco single" shall not be deemed an Album.);

c. "Budget Record" - a record bearing a suggested
retail list price at least $2.00 lower than the suggested
retail list price used for the top-line Phonograph Records
embodying performances of artists released by us or our
licensees in the territory concerned;

d. "Club Operation" - any direct sales to consumers
conducted on a mail order basis by us or our Licensees, e.g.
the Columbia Record Club;

e. "Composition" - a single musical composition,
irrespective of length, including all spoken words and
bridging passages and including a medley;

f. "Container Charge" - (1) with respect to disc
Phonograph Records, ten percent (10%) of the applicable Whole-
sale Price of such Phonograph Records; and (2) with respect to
Phonograph Records in non-disc configurations, twenty-five
percent (25%) of the applicable Wholesale Price of such Phono-
graph Records; provided that if our container charge (which we
represent is presently equal to 25%) is lowered or if we are no
longer paid on a Royalty Basis, the container charge on records in
non-disc configurations, shall be twenty percent (20%);

g. "Controlled Composition" - a composition written,
owned or controlled by you and/or any Person in which you have
a direct or indirect interest;

h. "Deliver" or "Delivered" - when used with respect
to Master Recordings, means the actual receipt by us of fully
mixed and edited Master Recordings, satisfactory to us and ready
for the manufacture of Phonograph Records, and all necessary
licenses and applicable approvals and consents;

i. "Inception of Recording" - the first recording of
performances and/or other sounds with a view to the ultimate
fixation of a Master Recording;

j. "Joint Recording" - any Master Recording embodying
your performance, together with the performance of another artist(s);

-:0-

k. "Licensees" – includes, without limitation, our subsidiaries and affiliates, wholly or partly owned, and our distributor(s);

l. "Master" and "Master Recording" – every recording of sound whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of phonograph records;

m. "Matrix" – any device now or hereafter used, directly or indirectly, in the manufacture of Phonograph Records and which is derived from a Master Recording;

n. "Net Sales" – gross sales less returns and credits;

o. "Person" and "Party"– any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing;

p. "Records" and "Phonograph Records" – all forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use, school use, juke box use, or use in means of transportation, embodying (a) sound alone or (b) sound coupled with visual images, e.g. "sight and sound" devices;

q. "Reissue Label" – a label, used primarily for reissues of recordings released previously;

r. "Royalty Base Price" – the applicable Wholesale Price of Phonograph Records less all taxes and less the applicable container charge;

s. "Sales Through Normal Retail Channels in the United States" – sales other than as described in subparagraphs 8.c., 8.d., 8.e., 8.g., 8.h. and 8.i.;

t. "Side" – a Recording of sufficient playing time to constitute one side of 45 r.p.m. record, but not less than two and one-quarter minutes of continuous sound; and

u. "Wholesale Price" – (a) With respect to Records sold for distribution in the United States: (1) the average net price received from distributors for our Phonograph Records during the six (6) month period immediately preceding the accounting period concerned, calculated separately for each separately priced Record series manufactured or sold; or (2) if there are no applicable independant distributors, our distributors' published subdistributor price in effect as of the

PIR 979

commencement of the accounting period concerned, less ten per-
cent (10%).    (b) With respect to Records sold for distribution
outside of the United States of America, one-half (1/2) of the
suggested or applicable retail list price in the country of
sale.  Notwithstanding the foregoing to the contrary, in no
event shall such wholesale Price be less than 'the wholesale
Price utilized by our distributor(s) in computing royalties
payable to us with respect to recordings hereunder.

23.  This agreement has been entered into in the Commonwealth
of Pennsylvania, and the validity, interpretation, and legal
effect of this agreement shall be governed by the laws of the
Commonwealth of Pennsylvania applicable to contracts entered
into and performed entirely within the Commonwealth of Penn-
sylvania, with respect to the termination of any claim, dispute
or disagreement, which may  arise out of the interpretation,
performance,  or breach of this agreement.  Any process in any
action or proceeding commenced in the courts of the Common-
wealth of Pennsylvania, or elsewhere arising out of any such
claim, dispute, or disagreement, may among other methods, be
served upon any party hereunder by delivering or mailing the
same, via registered or certified mail, return receipt re-
quested, as provided for herein, addressed to said party at
the address of such party or such other addresses as such
party may hereinafter designate.  Any such delivery or mail
service shall be deemed to have the same force and effect as
personal service within the Commonwealth of Pennsylvania or
the jurisdiction in which such action or proceeding may be
commenced.

24.  Except as otherwise specifically provided herein,
all notices hereunder shall be in writing and shall be given
by personal delivery, registered or certified mail or tele-
graph (prepaid), at the respective addresses hereinabove set
forth, or such other address or addresses as may be designated
by either party.  Such notices shall be deemed given when
mailed or delivered to a telegraph office, except that notice
of change of address shall be effective only from the date of
its receipt.  Each notice sent to us shall be directed to our
Vice President for Financial Affairs, and a copy of each such
notice shall be sent simultaneously to our Director of Legal
and Business Affairs.  Courtesy copies of each notice sent to
you shall be directed to Michael Rosenfeld, Esquire, 9665
Wilshire Boulevard, Suite 300, Beverly Hills, CA 90212 and
Dan Cleary, BNB Management, 9754 Wilshire Boulevard, Beverly
Hills, CA 90212.

25.  Those provisions of any applicable collective bar-
gaining agreement whicn are required, by the terms of such
agreement, to be included in this agreement shall be deemed
incorporated herein.

*\* see forth in ~~~~~~~~ 8.a. hereof*

*\*\* in lieu of the rates set forth in said ~~~~~~~~~~*

*E.L.*

26. This agreement contains the entire understanding of the Parties hereto relating to the subject matter hereof and cannot be changed except by an instrument signed by an officer of our company. A waiver by either Party of any term or condition of this agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. All remedies, rights, undertakings, obligations, and agreements contained in this agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either Party.

27. This agreement shall not become effective until executed by you and by us.

28. We shall have the right to designate the individual or individuals who shall render services as the producer or producers of recordings hereunder, subject to your reasonable approval; provided that you hereby approve Kenneth Gamble and Leon Huff to render services as producers of such recordings. We agree, however, that you shall have the right to produce no less than two (2) sides with respect to each single studio album project hereunder (four Sides with respect to each "double" studio album project) and that no less than two (2) sides which were actually produced by you shall be included on each single (rather than "double") studio album released hereunder (four Sides of each "double" studio album).

a. With respect to any services rendered by you to us as a producer of phonograph records (as such term is generally and customarily understood in the music recording industry) which are recorded and released hereunder, we shall pay to you or cause Gamble-Huff Productions or its designee to pay to you producer royalties. In every respect, all such producer royalties payable to you hereunder shall be computed accounted for, and paid in accordance with the royalty computation, royalty accounting and payment provisions of this

*basic — except* agreement, that the royalty rate shall be 6%/on \Albums and 45 r.p.m. "single" records and, in the event that aggregate Net Sales in the United States of any Phonograph Album (in disc or tape form) derived from masters recorded hereunder exceed 1,500,000 units, the basic album royalty rate set forth in *applicable Royalty B Price* *net sales*

*This Royalty = Base Price* subparagraph 8-a-(i) hereof shall be increased by two percent (2%) of the applicable ~~~~~~~~~ only with respect to /sales *net* in the United States of that particular album which are in excess of 1,000,000 units and (ii) in respect of Phonograph Records derived from Master recordings which are leased by us or our licensees to others for their distribution of Phonograph Records in or outside of the United States or any other use of such masters which is not otherwise provided for herein, 16 2/3% of our net receipts therefrom (after the deduction of all copyright, AFM and other applicable third party payments) will be paid to you.

b. If Kenneth Gamble and/or Leon Huff do not "supervise" the individuals rendering production services in

*ML.*

*# a- famous producer royalty in*

*# # your artist and producer*

connection with a particular album project, we shall pay to
you or cause Gamble-Huff Productions to pay you an amount
equal to 10% of the applicable ~~wholesale~~/Price of records
computed in the same manner as other royalties under this
agreement less the royalties paid to the actual producers of
the particular album. Notwithstanding any provision of this
agreement to the contrary, in such event, your basic royalty
rates (artist and producer) shall not be increased if sales
of any studio album exceed 1,500,000 units, it being under-
stood and agreed that such royalty rates shall not exceed
thirty percent (30%) in the aggregate with respect to any
phonograph record recorded hereunder.

*Royalty Base*
*net sales of*

     c.   Messrs. Gamble and/or Huff shall be deemed to
"supervise" a particular album project pursuant to the pro-
visions of paragraph 28.b. if they:

     1.   Render services as described in item (iv)
below with respect to the album project; and

     2.   Actually produce and/or render the services
described in items (i), (ii) or (iii) below with respect to
the majority of Sides contained on any such album project.

     (i)  Consult with any producer regarding
the concept, composition, title,
words, bridging passages, music and/or
selection of any songs recorded or
considered for recording in connection
with any album project~~x~~ .

     (ii)  Consult with you and/or any other
producer regarding the times, places
studios, studio equipment, engineers,
and methods of production and/or
recording techniques (including any
procedures for mixing and editing)
used or considered for use in con-
nection with any album project~~xxxx~~ .

     (iii)  Consult with you and/or any other
producer regarding the selection, and
use of any instrumental, vocal, or
other personnel (including arrangers
and copyists) used or considered for
use at recording sessions in connection
with any album project ~~xxxx~~ .

     (iv)  Consult with you and/or any other
producer regarding the selection, final
editing and sequencing of any Master
Recordings included on phonograph
records released in connection with
any album project.

     d.   If a "live album" is recorded without the services

of a producer to whom. we, Gamble-Huff Productions or its designee are obligated to pay royalties, we shall pay to you an amount equal to two percent (2%) of the applicable ~~Royalty Base~~ ~~XXXX Price~~/of records computed in the same manner as other royalties under this agreement.

*(margin notes: ily in ispect of ich particular ive album produced, Royalty Base)*

e. It is our intent for you to eventually produce more than two (2) of the Sides included on each studio Album recorded hereunder, but we make no representation or agreement as to when or whether we, in good faith, shall determine that it is in your and our best interests for you to do so. Prior to the commencement of recording each studio Album hereunder, we shall consult with you with respect to this matter and shall determine, in good faith, whether more than two (2) Sides of each Album recorded hereunder should be produced by you.

f. Prior to the recording of any Album hereunder, we shall submit to you an estimated budget of the Recording Costs and in this connection we shall describe the studio rates to be charged by the studio presently located at our offices in Philadelphia, Pennsylvania, and any other studios or which we may use regularly in lieu of such present studio.

29. a. We shall release in the United States each Album recorded under this agreement, within 120 days following delivery to us of such/Album, provided you have fulfilled all your material obligations hereunder and provided that we have sufficient Master Recordings and materials available at the times required by us to enable us to meet that release commitment under our normal release schedule, except that we shall have the option to reasonably extend said 120-day period if we determine in good faith that the release of any such album within such period would adversely effect the sale of phonograph records embodying your performances released after the date of this agreement.

*(margin note: studio)*

b. If we fail to comply with subparagraph 29.a. you shall have the right to notify us within fifteen (15) days after the end of the applicable period concerned of your desire that the term of this agreement be terminated if we do not so comply within sixty (60) days after our receipt of such notice. If we fail to do so, we shall have no liability whatsoever to you by reason thereof and your only remedy shall be to terminate the terms of this agreement by notice given to us within thirty (30) days after the expiration of said sixty-day period; on receipt by us of such notice, the term of this agreement shall terminate and all parties will be deemed to have fulfilled all of their obligations hereunder except those obligations which survive the end of the term (e.g., warranties, re-recording restrictions and obligations to pay royalties).

30. a. We shall reasonably consult with you regarding approval of the content and sequencing of any "Greatest Hits"

MK

such Masters were recorded) to you or lease any Unreleased Masters we shall make a payment to you in an amount equal to (i) 33 1/3% of our net receipts (after the deduction of all copyright, AFM and other applicable third party payments) ("net receipts") from our vendee or licensee with respect to Unreleased Masters embodying your performances as artists and/or (ii) 16 2/3% of our net receipts from such vendee or licensee with respect to Unreleased Masters produced by you;

The provisions of this paragraph 32.d. shall not be deemed applicable if we license or sell the Unreleased Masters together with a substantial portion of our catalogue of recordings featuring artists other than you, but we shall use our ⟨reasonable⟩ best efforts to: (i) license or sell such Unreleased Masters separately and not together with master recordings featuring other artists and (ii) make a reasonable allocation between advances applicable to the Unreleased Masters and master recordings featuring other artists if in fact we in good faith determine that such Unreleased Masters should be combined with other master recordings.

e. If we do not decide to sell or license such Unreleased Masters by the time you have completed your recording commitment during the initial term hereof, you shall have the right to secure offers to license the Unreleased Masters to third parties. Such offers shall be submitted to us and we shall have the right to accept or reject the same, provided that:

(1) We shall reject the same if: the offer is not from a major and reputable distributor; or the offer embodies financial terms and conditions which are not comparable to financial terms contained in offers which we could reasonably obtain from similar distributors; or if, in good faith, we determine that the distribution of such Unreleased Masters will adversely effect the sale of other Master Recordings recorded under this or previous agreements between you and us.

(2) We shall not reject such offer arbitrarily.

f. It is understood that the provisions of this paragraph 32 are included in this agreement because we understand that the costs of recording the Unreleased Sides have been paid for by us and charged to your royalty account. Accordingly, it is the intent of the parties to eventually exploit such Unreleased Sides and to allow you to participate, in the manner described above, in the advance monies ⟨we may⟩ ⟨(as described above)⟩ receive from third parties as the result of such exploitation of such Sides.

PIR 985

33. The advances and royalties provided for in this agreement are intended to include provisions for all Persons rendering services in connection with Recordings recorded and/or produced by you hereunder, it being understood and agreed that the payment to you of such advances and/or royalties shall completely discharge us of any obligation to make any payment whatsoever to any other Person who performs services as a member of The O'Jays and/or renders/services to you in connection with the production of phonograph records produced by you hereunder.

If the foregoing confirms your understanding of the Agreement between you and us, please sign this letter on the spaces provided below.

                              ASSORTED MUSIC, INC. d/b/a
                              PHILADELPHIA INTERNATIONAL RECORDS


                    BY:


ACCEPTED AND AGREED:



EDDIE LEVERT



WALTER WILLIAMS

p/k/a "THE O'JAYS"

In order to induce Assorted Music, Inc., d/b/a Philadelphia
International Records to enter into the foregoing agreement
with Eddie Levert and Walter Williams dated March 2, 1979,
the undersigned hereby assents to the execution of such
agreement and agrees to be bound by the terms and conditions
thereof.

GAMBLE-HUFF PRODUCTIONS

BY: _____