# EXHIBIT "I"

Agreement made June 27, 1980 between Assorted Music, Inc. (hereinafter "Assorted" or "us"), 309 South Broad Street, Philadelphia, Pennsylvania 19107, and Eddie Levert and Walter Williams, p/k/a The O'Jays, 12608 Miles, Cleveland, Ohio 44105 and c/o Eddie Levert, 3304 Warrington, Cleveland, Ohio 44120 (hereinafter "you").

1. Reference is made to the Exclusive Recording Artist Agreement between you and us dated March 2, 1979 (hereinafter the "Agreement").

2. The Agreement is modified as follows:

   A. The year "1984" is inserted in lieu of the year "1983" in line three of subparagraph 1.a. *W.W. E.L.*

   B. The number "twelve (12)" is inserted in lieu of the number "ten (10)" in line two of subparagraph 1.b.

   C. The following is inserted in lieu of subparagraph 2.a.: "Initial Period - 6 Studio Albums".

   D. Notwithstanding any contrary provision of the Agreement, you agree that your heretofore unreleased recordings *and all recordings recorded hereafter* may be released on the new TSOP, rather than *W.W. E.L.* the PIR label. However, if at any time following the date hereof the PIR and TSOP labels are distributed by different distribution companies (i.e., if PIR is distributed by one company, for example, CBS, and if TSOP is distributed by any other company, e.g. WEA, RCA or through independent distributors), Assorted will so notify you in writing within 30 days of the execution of the

agreement ⟨OR AGREEMENTS⟩ permitting distribution through different companies ⟨(WITH A COURTESY COPY TO MICHAEL ROSENFELD, ESQUIRE)⟩. At your option, by notice to us within 60 days of your receipt of such notice, all of your recordings which have not been scheduled for release as of the date of our receipt of such notice shall be distributed through the PIR rather than the TSOP label.

E. The Album tentatively entitled "The Year 2000", Record No. FZ-36416, embodying masters recorded under the Agreement and masters recorded under previous agreements between you and us shall be deemed to constitute, in all respects, the Second Studio Album recorded under the Agreement, except that:

(1) Upon execution of this modification, Assorted will pay to you by wire transfer to ⟨WALTER WILLIAMS, c/o⟩ NATIONAL CITY BANK, ⟨LEE HARVARD BRANCH⟩ Savings Account # 600720550% a $500,000 advance for such Second Studio Album, in lieu of the advances provided in subparagraphs 7.a.(i) and 7.a.(ii) of the Agreement.

(2) Notwithstanding any contrary provision of the Agreement, such advance shall be charged against and recouped from all royalties payable to you under the Agreement or any other agreement between you and us.

(3) The Second Studio Album ⟨IS INTENDED FOR RELEASE DURING THE FIFTH WEEK OF JULY; WE AGREE TO USE OUR BEST EFFORTS TO CAUSE SUCH ALBUM TO BE RELEASED ON Y SCHEDULE⟩.

F. Notwithstanding any contrary provision of the Agreement or this modification, commencing with any producer royalties which may become payable to you in respect of the Second Studio Album recorded under the Agreement, an amount equal to one-half of all producer

*[handwritten at top: # produced by you) provided that the Third Studio Album shall be deemed to commence on January 30, 1981 ~~...~~ Recording of /N /N E.L.]*

royalties which may become payable to you thereunder in respect to the Second and succeeding Studio Albums shall be paid to you on the basis of net sales from the first phonograph record sold without regard to the recoupment of recording costs, and no advances payable under the Agreement shall be charged against or recouped from such one-half share of such producer royalties.

G. The following new subparagraph 17.c. (mistakenly lettered "b." on page 16) is added to the Agreement: ~~Commencing with~~ The Recording of the Third Studio Album *[handwritten: shall commence in September 1980] (by your recording of selections to be* Recorded under the Agreement, we shall commence the recording of each succeeding Studio Album within 12 months after the completion of recording of the immediately preceding Studio Album. If we fail to comply with the preceding sentence, and you are not in default of this Agreement, provided that you are willing and able to commence recording the Studio Album in question as requested upon the expiration of the applicable 12-month period, we shall pay to you an advance equal to the amount of the advances paid to you under subparagraphs 7.(a)(i) and 7.(a)(ii) of the Agreement in respect of the immediately preceding Studio Album, provided that the First Studio Album shall be deemed to "immediately precede" the Third Studio Album only for the purpose of calculating such advance. Such advance shall be paid in lieu of the payment of the applicable advances provided in subparagraphs 7.a.(i) and 7.a.(ii) and shall be paid in full satisfaction of our obligation

*[handwritten margin notes: E.L. /N; after date you may commence such recording and furnish; /N /N E.L.]*

*[handwritten at bottom: ** unless we pay to you, by such date, the advance for such album ...]*

-4-

to commence the recording of the Studio Album in question within the applicable 12-month period. Such advance will be paid to you in two installments: one-half upon the expiration of the applicable 12-month period and one-half within two months thereafter.

H. The following is inserted in lieu of the first 19 lines of subparagraph 17.c (mistakenly lettered "b" on page 16) and said subparagraph is relettered "d.":

"~~Commencing with~~ The Third Studio Album recorded under the Agreement, [WILL BE RELEASED IN THE UNITED STATES BY MARCH 31, 1981,] we shall release each succeeding Studio Album in the United States within 12 months after the release of the immediately preceding Studio Album. If we fail to comply with the preceding sentence, your sole remedy shall be to notify us, within sixty (60) days prior to the end of the applicable 12-month period, of your desire that this Agreement be terminated if we do not so comply within sixty (60) days after the expiration of such 12-month period. If we fail to comply after receipt of such notice and prior to the expiration of the final 60-day period, this Agreement shall terminate upon the expiration of such period and all parties will be deemed to have fulfilled all of their obligations, except those which survive the end of the term (e.g., warranties, re-recording restrictions and obligations to pay royalties). In full settlement of our obligations in connection therewith, we shall pay to you an advance in an amount equal to:"

I.   The following is inserted in lieu of subparagraph 29.e. of the agreement:  "It is our intent for you to ~~eventually~~ produce four (4) of the Sides included on each Studio Album recorded hereunder, but we make no representation or agreement as to ~~which~~ whether or whether we, in good faith, shall determine that it is in your and our best interests for you to do so.  Prior to the commencement of recording for the Third and each succeeding Studio Album recorded hereunder, we shall consult with you with respect to this matter and shall determine, in good faith, whether four (4) sides of each such Album recorded hereunder should be produced by you".

J.   You herewith:

(1) · (For yourselves, your heirs, executors, administrators and assigns), REMISE, RELEASE, QUIT CLAIM, AND FOREVER DISCHARGE us, our successors and assigns of and from any and all manner of actions and causes of actions, suits, debts, claims and demands whatsoever, in law or in equity, by reason of or in any way arising from the purported termination of the term of the Agreement by letter dated May 13, 1980 from your Attorney, Michael Rosenfeld, Esquire, one true and correct copy of which is attached hereto and incorporated herein as Exhibit "A";

PIR 996

   (2) Reaffirm that the Agreement constitute a legal, binding and enforceable agreement; and

   (3) Acknowledge that you understand the terms and provisions of the Agreement and are legally bound thereby.

  3. Except as modified by the provisions hereof, the Agreement shall remain in full force and effect.

*[signature]*
Eddie Levert

*[signature]*
Walter Williams

p/k/a "The O'Jays"


Accepted and Agreed:

Assorted Music, Inc.

d/b/a Philadelphia International Records

By: *[signature]*

# EXHIBIT "J"

Agreement made on October 5, 1982 between Walter Williams, Eddie Levert and Sammy Strain performing together as the musical group p/k/a "The O'Jays" (hereinafter "You") and Assorted Music, Inc. d/b/a Philadelphia International Records, 309 South Broad Street, Philadelphia, PA 19107 (hereinafter "PIR").

1. Reference is made to you and to the Agreement between you and PIR dated March 2, 1979, as the same has been and may be supplemented, modified, amended, extended and/or suspended (hereinafter the "Agreement"). All capitalized terms herein shall have the same meanings as those terms are defined or used in the Agreement. The Agreement is hereby modified as provided in paragraphs 2 through 9 below.

2. By reason of the suspension and extension of the term of the Agreement during the period from December 31, 1980 to September 15, 1981, the initial term of the Agreement will expire on January 15, 1985.

3. The text of the second line of subparagraph 7(b) of the Agreement is deleted and the following is inserted in lieu thereof:

"the advance for the fourth, fifth and/or sixth studio albums recorded"

4. Notwithstanding subparagraphs 7(a) and 7(b) of the Agreement, with respect to the Fourth Studio Album recorded during the initial term of the Agreement, the aggregate Reduced Studio Album Advance for such Album (hereinafter the "Reduced Advance") shall be Two Hundred Ninety-One Thousand Four Hundred and Fifty-Eight Dollars and Eighty-Five cents ($291,458.85)

(including Recording Costs). Of such Reduced Advance, PIR will pay to you One Hundred and Twenty-Five Thousand Dollars ($125,000) upon execution of this Agreement. Within thirty (30) days after the recording of such Album has been completed, subject to the fourth sentence of this paragraph 4, PIR will pay to you an additional portion of such Reduced Advance, which shall equal the difference between: (1) the aggregate Reduced Advance (including Recording Costs) ($291,458.85) and (2) the sum of: (a) the Recording Costs for such Fourth Studio Album [now estimated to be One Hundred Forty-One Thousand Four Hundred and Fifty-Eight Dollars and Eighty-Five cents ($141,458.85)] and (b) the portion of such Reduced Advance paid to you upon the execution of this agreement ($125,000). All Recording Costs for the Fourth Studio Album which exceed our Estimated Budget (hereinafter "Excess Recording Costs") will be charged against or recouped from royalties, as provided in the Agreement; provided, however, that only such Excess Recording Costs with respect to Recordings produced by you or for which you are responsible, whether directly or indirectly, will be charged against and deducted from the portion of the Reduced Studio Advance referred to in the third sentence of this paragraph 4.

5. PIR and you agree that you have the right to produce a minimum of two sides on each Studio Album. However, on the Fourth Studio Album, you shall produce one side and have the option to produce a second side. In order to exercise said option, you shall notify PIR within a reasonable time so as to not disrupt the recording schedule and shall present PIR with an Estimated Recording Budget.

-3-

6. PIR shall notify you when 85% of the Estimated Budget ($141,458.84) shall have been expended.

7. The text of subparagraph 8(h) of the Agreement is deleted and the following is inserted in lieu thereof:

> "h. the royalty rate on Phonograph Records sold by us or our Licensees for distribution outside of the United States shall be one-half (½) of the applicable royalty rate which would have been payable to you if such Records were sold for distribution in the United States; provided, however, that:
>
>> 1. With respect to each territory in Europe, if you conduct an extensive public relations and public appearance tour of at least 4 days in duration (hereinafter the "Tour") in at least three of the following territories: The United Kingdom, France, Germany or Italy, then the royalty rate first referred to in this subparagraph (h) shall be increased to three-fourths (3/4) of the otherwise applicable royalty rate in all such territories;
>>
>> 2. With respect to each territory within the continent of Africa in which you conduct such a Tour, the royalty rate first referred to in this subparagraph (h) shall be increased to three-fourths (3/4) of the otherwise applicable royalty rate; and
>>
>> 3. With respect to the rest of the world, if you conduct such a Tour of Japan and at least three of the territories referred to in clause one (1) of this subparagraph (h), the royalty rate first referred to herein shall be increased to three-fourths (3/4) of the otherwise applicable royalty rate.
>
> Any such increase(s) shall become effective on the date on which you commence the applicable Tour(s), and shall apply only to Records sold in applicable territories after the commencement of such Tour(s). All royalties referred to in this subparagraph (h) will be computed on the basis of Ninety percent (90%) of Net Sales, unless we are paid on the basis of One-Hundred percent (100%) of Net Sales, in which event your royalties will be computed on the basis of One-Hundred percent (100%) of Net Sales."

-4-

8. PIR will use all reasonable efforts to persuade the distributor of the Fourth Studio Album to agree to expend at least Seventy-Five Thousand Dollars ($75,000), on a non-recoupable basis for promotional expenses to be incurred in connection with the distribution of such Album, which shall include at least Twenty-Five Thousand Dollars ($25,000) for the production of an audiovisual film clip to be distributed and performed throughout the world for promotional purposes only.

9. Except as modified by the provisions hereof, the Agreement shall remain in full force and effect.

AGREED TO:

_____
Eddie Levert

_____      _____
Sammy Strain                          Walter Williams


ASSORTED MUSIC, INC.
d/b/a PHILADELPHIA INTERNATIONAL RECO[RDS]

By: _____
V.P. BUSINESS AFFAIRS

# EXHIBIT "K"

AGREEMENT made this 13th day of December, 1984 between Eddie Levert, Walter Williams and Sammy Strain performing together as the musical group professionally known as "The O'Jays", c/o Howard Manning, Jr., Esquire, Manning & Hart-Nibrigg, 4929 Wilshire Boulevard, Suite 1020, Los Angeles, CA 90010-3869 (hereinafter "you") and Assorted Music, Inc. d/b/a Philadelphia International Records, 309 South Broad Street, Philadelphia, PA 19107 (hereinafter "PIR").

1. Reference is made to the Agreement between you and PIR dated March 2, 1979, as amended (the "Agreement") and to the next Album to be recorded under the Agreement (Album "I").

2. Both parties hereto acknowledge the following:

   A. You are scheduled to perform for the purpose of recording Album I and PIR is scheduled to record Album I between November 15, 1984 and January 15, 1985.

   B. The realization of maximum sales of Album I is of such paramount importance that the recording of "hit" Singles with due regard for the time required to conceive and record superior recordings with the potential for "Gold" and "Platinum" sales, and not mere completion of the recording, delivery and release of such Album within arbitrary timeframes, is the prime objective of the Album I Recording Project.

3. In consideration of the mutual premises and undertakings herein set forth, for other good and valuable consideration, and intending to be legally bound, you and PIR warrant, represent and agree that:

   A. The Agreement is in full force and effect; you have no outstanding claims against PIR under the Agreement and hereby release any claim you have asserted thereunder arising prior to the date hereof, excluding normal audit claims which will not effect your recording services once recording has commenced under the Agreement.

   B. In lieu of the dates provided in the Agreement the expiration dates for the initial term of the Agreement and subsequent Contract Periods, and the recording, delivery, art work photograph, and release dates for Album I and subsequent Option Albums will be as follows:

   1) Initial Term.

   February 28, 1985.

   2) Subsequent Contract Periods.

   One year after the date on which the immediately preceding Contract Period terminates.

3) Album I.

| Recording | Delivery | Art Work Photographs | Release |
|---|---|---|---|
| Dec. 12, 1984- Feb. 28, 1985 | March 15, 1985 | March 30, 1985 | June 15, 1985 |

4) Subsequent Option Albums.

The recording, delivery, art work photograph, and release dates for each subsequent Album, if any, will be one year after the corresponding date for the immediately preceding Album.

C. Between December 13, 1984 and January 15, 1985, you and PIR will approve or disapprove your production on Album I of as many as three (3) Sides embodying compositions included on demonstration tapes presented by you to PIR on such date.

D. Not later than February 15, 1985, you and PIR will approve or disapprove the recording of more than 14 but not more than 16 Sides in connection with the recording of Album I which will be charged against Recording Costs for such Album.

4. Notwithstanding the provisions of the Agreement regarding the amount of the Reduced Studio Advance for Album I, in lieu of the sum of $200,000 therein provided, with respect to Album I only, the aggregate Reduced Studio Album Advance (including Artist Advances and Recording Costs) will be $420,000. Of such sum, at least $170,000 has or will be paid to you as an Artist Advance. You hereby acknowledge receipt of the payment of $20,000 which you and PIR agree will not be charged to or deducted from the Advance due you in respect of Album I. Instead, you and PIR agree that said $20,000 will be charged against and deducted from any royalties becoming due you with respect to Album I or any Advance due you with respect to the Album after Album I. In consideration of such agreement, PIR agrees that $100,000 of the remaining balance of such Artist Advance will be paid promptly upon commencement of your performances for the purpose of recording Album I. The remaining $50,000 will be paid to you promptly after the completion of your performances for the purpose of recording Album I, provided, however that Recording Costs for which you are directly or indirectly responsible with respect to Sides produced by you, which exceed the approved budget for such Sides, will be charged against and deducted from said $50,000 portion of the Reduced Studio Advance. PIR will notify you of the amount of any such excess and will pay to you the balance due, less any such amount, within thirty days after your completion of the production of any such Sides.

The balance of the reduced Advance for Album I, $250,000, will be allocated to Recording Costs for Album I. If such Recording Costs are less than $250,000, the difference between such amount and actual Recording Costs for Album I will be paid to you as an additional Artist Advance. Any such additional Artist Advance for Album I will be paid to you within thirty (30) days after delivery to PIR.

The entire Reduced Studio Advance for Album I will be charged against and recouped from royalties as provided in the Agreement.

5. PIR will use its best reasonable efforts to induce the distributor of each Album recorded by you under the Agreement to commit to spend at least $100,000 in connection with the promotion, marketing, merchandising and/or advertising of each such Album, including, without limitation, the production of a promotional video clip for the first Single to be released from each such Album.

6. With respect to the unrecouped deficit balance reflected on your Artist Royalty Statement dated June 30, 1984, you and PIR agree that upon completion of your performances for the purpose of recording Album I, PIR will reduce the amount of such unrecouped deficit as of June 30, 1984 to $400,000, but only with respect to the computation and payment of royalties becoming due under the Agreement regarding Net Sales of Album I, after recoupment of Recording Costs applicable to such Album.

7. This letter agreement has been entered into in the Commonwealth of Pennsylvania, and its validity, interpretation and legal effect shall be governed by the laws of the Commonwealth of Pennsylvania applicable to contracts entered into and performed entirely therein.

8. Except as modified by the provisions hereof, the Agreement shall remain in full force and effect.

AGREED:

By: *[signature]*
EDDIE LEVERT

By: *[signature]*
WALTER WILLIAMS

By: *[signature]*
SAMMY STRAIN

ASSORTED MUSIC, INC.
d/b/a Philadelphia
International Records

By: *[signature]*

-3-

EXHIBIT "L"

```
 1           IN THE UNITED STATES DISTRICT COURT
 2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                        - - -
 4   EDDIE LEVERT,                  :  CIVIL ACTION
     WALTER WILLIAMS,               :
 5   d/b/a as THE O'JAYS            :
                                    :
 6              v.                  :     ORIGINAL
                                    :
 7   PHILADELPHIA                   :
     INTERNATIONAL RECORDS,         :
 8   ASSORTED MUSIC, INC.,          :
     GAMBLE-HUFF PRODUCTIONS,       :
 9   KENNETH GAMBLE, CHUCK          :
     GAMBLE and LEON HUFF           :
10   and THE RIGHT STUFF/           :
     A DIVISION OF CAPITOL          :  NO.
11   RECORDS, INC.                  :  04-1489
                        - - -
12
13               September 29, 2004
                        - - -
14
15           Oral deposition of ED WILLIS
     LEVERT held in the offices of Blank Rome,
16   LLP, One Logan Square, Philadelphia,
     Pennsylvania 19103 commencing at 10:27
17   a.m., on the above date, before Linda
     Rossi Rios, a Federally Approved
18   Registered Professional Reporter and
     Notary Public of the Commonwealth of
19   Pennsylvania.
                        - - -
20
21
22          ESQUIRE DEPOSITION SERVICES
            1880 John F. Kennedy Boulevard
                     15th Floor
23        Philadelphia, Pennsylvania 19103
                  (215) 988-9191
24
```

1 fell on the floor.
2     Q.    Have you spoken to him since
3 this lawsuit was commenced?
4     A.    But it was in reference to
5 something else totally. He and my son
6 was talking about doing a -- some kind of
7 movie as far as "The Philadelphia Story."
8 So we had spoke about that. Because my
9 son is a producer, too. So he had -- he
10 wanted my son to be involved in "The
11 Philadelphia Story" as far as making the
12 movie.
13     Q.    Did you ever have any type
14 of relationship with Leon Huff?
15     A.    Absolutely.
16     Q.    Can you describe your
17 relationship with Mr. Huff?
18     A.    Same as Mr. Gamble. We
19 spent a lot of time. We did a lot of
20 things together. We were friends. We
21 were friends.
22     Q.    This goes back to the '70s?
23     A.    Absolutely.
24     Q.    Have you ever met Chuck

1  Gamble?
2     A.    Occasionally, yes.
3     Q.    Do you have any type of
4  relationship with him?
5     A.    No.
6     Q.    Could you tell me, in your
7  words, why you brought this lawsuit
8  against Assorted Music, Inc.? I just
9  want to focus on Assorted Music, Inc.
10          MR. GRANT: I would object
11     to that. That's a legal
12     determination.
13 BY MR. WARSHAVSKY:
14    Q.    To the best of your
15 knowledge.
16    A.    Could you ask it again?
17    Q.    Sure, I'll try and rephrase
18 it.
19          Assorted Music, Inc., which
20 for many years has done business as PIR,
21 Philadelphia International Records, in
22 your own words, why did you decide to
23 bring this lawsuit against them?
24    A.    Simply because of the fact